# In the United States Court of Federal Claims

No. 16-912
Filed: August 2, 2023

|  |
|---|
| **PERRY LOVERIDGE, et al.,**<br><br>        *Plaintiffs*,<br><br>v.<br><br>**THE UNITED STATES,**<br><br>        *Defendant*. |

*Thomas S. Stewart and Reed W. Ripley*, Stewart, Wald & Smith, LLC, Kansas City, MO, for Plaintiffs.

*Kimberly A. Cullen and Leeann Kim*, Trial Attorney, *Todd Kim*, Assistant Attorney General, Environment and Natural Resources Division, U.S. Department of Justice, Washington, D.C, for Defendant.

## MEMORANDUM OPINION AND ORDER

**TAPP, Judge.**

Years of fitful progress, bring us again to another unavailing summary judgment claim. The parties now dispute the method for calculating damages. The Court declines to impose its own metric on the Parties' experts, having not yet received the benefit of context best provided at trial. Accordingly, while some general notions regarding the backdrop of damages available in rails-to-trails cases might be helpful, a final determination regarding admissibility and the weight of such expert testimony must await another day.

Broadly speaking, however, damages must be calculated utilizing the real-world conditions of a property before and after the taking. Here, that includes a pre-existing contract to operate a local scenic train until at least 2026 on the same rail line. The Court also finds that Plaintiffs may offer expert testimony on how the market value of their property is impacted by the uncertainty surrounding the future use of the easements by the trail operator.

### I.   Background

Plaintiffs' properties, located in Oregon, were burdened by a railroad easement later converted to interim trail use through the Notice of Interim Trail Use ("NITU") process. *See Loveridge v. United States*, 139 Fed. Cl. 122 (2018) ("*Loveridge I*"). The remaining property owners in this case are Camp Double J, LLC ("CDJ") (owners of the Joslin parcels), the Laviolette family (owner of the Jetty Fishery parcel), and Old Mill Investment, LLC ("OMI")

(owner of the OMI property). (Def.'s Mot. for Summ. J. ("Def.'s Mot.") at 11, ECF No. 178; Pls.' Cross Mot. for Summ. J. ("Pls.' Cross-Mot.") at 10, ECF No. 180).

In 2006, when the Port of Tillamook Bay Railroad ("POTB"), a successor in interest to the original railroad operator, was still actively running freight trains over the railroad, it entered a contract with the Oregon Coast Scenic Railroad ("OCSR"), a local tourist rail service. (Def.'s Mot. Ex. E at 2–4). The contract gives OCSR the right to operate a scenic passenger excursion train over the same rail line. (*Id.*) Following a renewal of the agreement in 2012, POTB authorized OCSR's use of the rail line through December 2016 with two options for additional five-year renewals. (Def.'s Mot. Ex. F at 39,41; *see also* Ex. G.). OCSR exercised the first five-year extension in 2016 and the second in 2021, thereby authorizing operations of the tourist train until at least 2026. (Def.'s Mot. Ex. F at 31:14-24; Ex. G.). In 2007, a storm damaged portions of the rail line. (Def.'s Mot. Ex. E at 2). POTB ceased freight train operation in the aftermath, but OCSR continues to operate the tourist train. (Pls.' Cross-Mot. at 10, 17).

In May of 2016, POTB notified the Surface Transportation Board ("STB") of intent to abandon its service. (Def.'s Mot. Ex. A). POTB also executed an agreement ("trail use agreement") with the Salmonberry Trail Intergovernmental Agency ("STIA") for interim trail use of the railroad; this agreement expressly provides for OCSR's continuing use of the tourist train. (Def.'s Mot. Ex. C at 5, § A(1)). The trail use agreement leases the railroad corridor to STIA for 99 years and authorizes it to use the railroad to "establish, install, construct, maintain, operate and repair a trail and pathway . . . ." (*Id.* at 6). Although POTB and STIA reached their agreement in 2018, no construction has taken place at the site to date. (Def.'s Mot. at 20; Pls.' Cross-Mot. at 13).

Two properties (the Joslin and the Jetty Fishery parcels) include right-of-way agreements with POTB that allow the property owners to use parts of the railroad corridor for ingress and egress; i.e., the right to use a driveway that crosses over the railroad and connects the properties to the highway. (*See* Def.'s Mot. Exs. Y, HH, S, GG). The third property (the OMI property) has access to the highway through two public roads. (Def.'s Mot. Ex. Z at 97:14-21; 136:13-137:1). The trail use agreement states that POTB "retains the right to administer, manage, and perform all Existing Use Agreements." (Def.'s Mot. Ex. C at 7, § D(3)). The trail use agreement defined existing use to encompass "third party contracts," approved by POTB that "affect[] the Leased Property," including "right of way agreements," and "crossing agreements." (*Id.* at 6, § D(2)). The United States claims that all three accessways in this case are considered "existing use agreement[s]" and incorporated into the trail use agreement. (Def.'s Mot. at 22–3).

The Court first reviewed the original deeds to the railroad company to determine if each deed conveyed a fee simple interest thus barring takings claim, or an easement opening the door for takings claim. *See Loveridge I*; *see also Loveridge v. United States*, Case No. 16-912, 2019 U.S. Claims LEXIS 55 (Fed. Cl. Feb. 8, 2019) ("*Loveridge II*"). In *Loveridge III*, for certain underlying deeds that conveyed only an easement, the Court assessed whether the scope of the easement was broad enough to allow for interim trail use and railbanking. *Loveridge v. United States*, 148 Fed. Cl. 279 (2020) ("*Loveridge III*"). In *Loveridge IV*, the Court found that to receive just compensation, Plaintiffs need not demonstrate that the railroad easement was legally abandoned under Oregon law prior to the issuance of the NITU and addressed questions about

adjacency to the rail corridor. *Loveridge v. United States*, 149 Fed. Cl. 64 (2022) ("*Loveridge IV*"). Against this backdrop, the Court turns to the current dispute.

## II.   Analysis

Under RCFC 56(a), the Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact, and "the movant is entitled to judgment as a matter of law." In evaluating cross-motions for summary judgment, the Court evaluates "each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987). The moving party may meet its burden by "pointing out . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

In rails to trails cases, the Court uses the "before and after" method of assessing damages where just compensation equals the difference in market value of the land before and after the easement is imposed. *Otay Mesa Prop., L.P. v. United States*, 670 F.3d 1358, 1364 (Fed. Cir. 2012). In addition to the value of the property taken, just compensation will include any decrease in value of the parts not taken if that decrease in value is caused by the taking. *United States v. Grizzard*, 219 U.S. 180, 185 (1911) ("When the part not taken is left in such shape or condition as to be in itself of less value than before, the owner is entitled to additional damages on that account."). Plaintiffs bear the burden of proving the value of the interest taken, including any damages to the property's remainder. *See Bd. of Cnty. Supervisors v. United States*, 276 F.3d 1359, 1364 (Fed. Cir. 2002); *Miller v. United States*, 620 F.2d 812, 828 (1980). In ruling on the disputes over valuation standards in takings cases, the Court is cognizant of the guiding principle that "just compensation should be carefully tailored to the circumstances of each particular case." *See Otay Mesa*, 670 F.3d at 1368.

### A.  The Before Condition and the Oregon Coast Scenic Railroad

Neither party disputes the fact that OCSR has been continuously operating the scenic train on the railway corridor in question and that the scenic train remains active today. (Def.'s Mot. at 24; Pls.' Cross-Mot. at 10–11). OCSR and POTB contracted to run this scenic train before the NITU, and the contract does not expire until at least 2026. (*Id.*). The United States argues that the "before" condition must consider that the Plaintiffs' properties are encumbered by the OCSR easement because, even in the absence of the NITU, OCSR would continue to operate under its agreement with POTB. (Def.'s Mot. at 24–7). Conversely, Plaintiffs argue that the Court should find that OCSR's easement either extinguished through the NITU process along with POTB's easement or that it is set for expiration no later than 2026. (Pls.' Cross-Mot. at 24–25). The Court disagrees that the scenic train must be excluded from the "before condition."

As an initial matter, Plaintiffs argue that in the "before" condition (where POTB abandons its common carrier obligations without STB's involvement) OCSR's otherwise valid contractual right to operate the scenic train automatically extinguishes "along with POTB's easement;" yet Plaintiffs provide no legal support for this proposition. (*See* Pls.' Cross-Mot. at 24–25, 33). Consequently, the Court rejects this argument. *Estee Lauder Inc. v. L'Oreal, S.A.*, 129 F.3d 588, 595 (Fed. Cir. 1997) ( "arguments of counsel" cannot substitute for actual

3

evidence in the record); *Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.*, 731 F.2d 831, 836 (Fed. Cir. 1984) (parties may not rely on "conclusory statements" to support their position); *Seventh Dimension, LLC v. United States*, 160 Fed. Cl. 1 (2022) ("…[T]he Court expects the government to submit facts to support its arguments—and not rely on mere ipse dixit.").[1]

However, Plaintiffs also argue that the OCSR train should be excluded from the "before" condition because, as a matter of law, appraisers must assess the before condition as if the property is "vacant." (Pls.' Cross-Mot. at 8). The United States responds that the before condition must reflect "the real-world condition of the property," analogizing this case to *Rasmuson v. United States*, 807 F.3d 1343, 1345–46 (Fed. Cir. 2015).

In *Rasmuson*, the parties disagreed whether the "before" condition should include the remnants of the railroad's use, including earthen embankments, ties, and poor soil conditions. *Id*. The Federal Circuit found that the "before" condition "has to account for [the] physical conditions," of the land when "[a]bsent the NITUs, the land would have returned to the landowners," with those physical conditions. *Id*. at 1346. Plaintiffs distinguish that decision by positing that *Rasmuson* "exclusively focused on certain aspects of the taken property's physical condition, not its legal condition." (Pls.' Cross-Mot. at 21). Yet, nothing in the language of *Rasmuson* itself points to this distinction. In fact, *Rasmuson's* holding followed from the nature of the railroad company's legal responsibility, reasoning that even absent the NITU, the railroad company "did not have an obligation" to remove the physical encumbrance on the property owner's land. *Rasmuson*, at 1346. (finding that if the "before" condition did not account for the costs of removing the physical remnants the appraisal "will result in an artificially inflated value and yield a windfall to the landowner.").

Like *Rasmuson*, the NITU in this case did not impact POTB's legal obligation to OCSR for continued operation of the excursion train. (*See* Def.'s Mot. Ex. C at 5, § A(1) (noting that POTB's grant of lease to STIA is "specifically subject to the terms of this Agreement, including . . . the Oregon Coast Scenic Railroad (OCSR) Rail Use Agreement . . . .")). As both parties concede, OCSR continues its train operation under the POTB agreement despite the trail use agreement and operations will likely continue until at least 2026. (Def.'s Mot. at 24; Pls.' Cross-Mot. at 10–11, 22). What's more, the United States argues that STB lacks jurisdiction to

---

[1] At oral argument, Plaintiffs also relied on *Minto v. Salem Water, Light & Power Co.*, 120 Ore. 202 (Or. 1926) as support that OCSR's lessee rights may be extinguished under state law because they would be beyond the scope of the original POTB easement. (OA Tr. 28:10-25–29:1-13, ECF No. 191). In *Minto* the Oregon court denied grantee the right to conduct above-ground water filtration because the language of that deed was "clear and unambiguous," in only granting below-surface rights. *Id*. at 212–13. The deed to POTB does not distinguish POTB's railroad use from OCSR's nearly as clearly and unambiguously as the two uses in *Minto*. *Id*. Furthermore, *Minto* acknowledged that property owners' acceptance of "open, continuous, [and] exclusive," use can still create "easement by prescription," despite the deed's language. *Id*. at 214–16. Even though Plaintiffs claim that they can "probably [] exclude that excursion train from its right-of-way," that does not change the fact that Plaintiffs have not challenged OCSR's use since 2006, further differentiating this case from *Minto*. (OA Tr. 28:23–25–29:1–4).

modify or terminate the preexisting agreement between POTB and OCSR. (Def.'s Mot. at 31). The United States notes that STB's jurisdiction is limited to rail carriers that provide "common carrier" railroad transportation as "part of the interstate rail network." (*Id.*); *see also* 49 U.S.C. § 10501(a)(2) (the STB's "[j]urisdiction under paragraph (1) applies only to transportation in the United States between a place in--(A) a State and a place in the same or another State as part of the interstate rail network."). Rail carriers that provide transportation on a "wholly intrastate," basis—including the scenic train—are, according to the United States, outside the STB's jurisdiction. (Def.'s Mot. at 18). In practice as well, the STB has previously declined to exercise jurisdiction over intrastate excursion trains.[2] Because the NITU did not, and potentially could not have, altered the agreement between POTB and OCSR, the "before" condition must reflect OCSR's continued operation.

At oral argument, Plaintiffs identified what they take to be the two primary sources supporting the theory that the "before" condition always views the land as vacant: *Raulerson v. United States*, 99 Fed. Cl. 9 (Fed. Cl. 2011) and the Yellow Book. (June 28, 2023, Oral Argument Transcript ("OA Tr.") 25:1-25–26:1-25, ECF No. 191). Despite Plaintiffs' contentions, *Raulerson* does not endorse their broad assertion. *Raulerson* emphasized that just compensation is determined by analyzing "the nature of" the exact "state-created property interest" that the NITU blocks. 99 Fed. Cl. at 12. Instead of adopting a blanket rule as Plaintiffs desire, the Court in *Raulerson* reviewed the text and scope of the railbanking agreement in that case to determine the nature of the state-created property interest that was blocked. Because the trail use agreement indicated that the railroad company was selling *all of its* rights to the trail operator, the *Raulerson* Court found that in measuring just compensation the land should be viewed as fully unencumbered in the before condition. *See Raulerson*, at 11 (noting that the trail agreement "agree[d] to sell . . . as is and by quit-claim . . . *all of such right, title and interest* that SELLER may have in the [railroad easement]" to the trail manager) (emphasis added). Here, unlike *Raulerson*, the railroad company conditionally transferred its rights, expressly preserving the scenic train contract. *Raulerson* does not endorse the rigid rule the Plaintiffs contend it does. *See Georgia-Pacific Corp. v. United States*, 226 Ct. Cl. 95, 106 (1980) (the Court's just compensation analysis "cannot be reduced to a formula," or hostage to "inexorable rules").

Neither do the Yellow Book's intermittent uses of the phrase "as if vacant," impose such an inexorable rule. The Yellow Book's use of that phrase, like in sections 1.5.1.1 and 2.3.3.1.1, appears in the context of defining "the highest and best use" and not in the context of the before and after rule. (*See* Def.'s Mot. Ex. FF, The Uniform Appraisal Standards for Federal Land Acquisition ("the Yellow Book"), at 36–37, 75). Out of context references cannot suppress the particular facts of this case and the close analogy to *Rasmuson*. 807 F.3d at n.1 (Fed. Cir. 2015) (noting that the remnants of the railway "are also relevant to determining the 'highest and best use' of the landowners' property," and that the fair market value must be assessed "in light of the physical condition of the property"); *see also Shelden v. United States*, 34 Fed. Cl. 355, 373

---

[2] *See Fun Trains, Inc.*, STB Finance Docket No. 33472 (1998); *Revolution Rail Holding Co., LLC—Acquisition Exemption—Saratoga & North Creek Railway, LLC*, FD 36535, 2021 STB LEXIS 217, *5 (STB served Sept. 10, 2021); *Denver & Rio Grande Ry. Hist. Found.—Pet. for Declaratory Order*, FD 35496, 2014 WL 4068219, *8 (STB served Aug. 18, 2014), *reconsideration denied*, 2015 WL 1310043 (STB served Mar. 24, 2015).

5

(1995) ("The fair market value of the highest and best use as a vacant building lot must take into account certain adjustments to compensate for the fact that a damaged house currently exists on the property.").

OCSR exercised its final extension option to continue its operations until 2026. (*See* Def.'s Mot. at 18). Although OCSR may extend its operations beyond 2026, no such agreement currently exists. (*See* Def.'s Mot. Ex. C at 7–8, § D(5); OA Tr. 38:24-25–39:1-7). Although the Court agrees that base valuation must find the parcels burdened by the operating scenic railroad, that is not the end of the analysis. The Court does not indulge the United States' curious avoidance of the fact that OCSR's operation beyond 2026 is uncertain and that this fact, just like OCSR's actual operation, cannot be excluded from the "before" condition. All factors of OCSR's agreement could realistically impact a reasonable buyer's assessment of value and therefore relate to valuation. *Snowbank Enterprises, Inc. v. United States*, 6 Cl. Ct. 476, 484 (1984) (finding that "[a]ny and all factors, which would cause a reasonable seller," to pay a different sale price should be considered in valuation).[3] Evaluating the exact extent of that impact awaits trial.

### B. *Loss of Access and Loss of Crossing Rights Damages*

The United States also argues that Plaintiffs' claim for loss of access or crossing rights should be denied as a matter of law. (Def.'s Mot. at 33). The United States posits three

---

[3] Plaintiffs quarrel that including OCSR's continued operation in the "before" condition may complicate the Court's findings on liability. (Def.'s Mot. at 29–32). Judge Firestone previously rejected the argument that the United States should only be liable for adding a trail use easement. *Loveridge IV*, 149 Fed. Cl. at 71–72. The Court will not revisit this finding in part because the United States concedes that it is no longer contesting the scope of liability in this case. (*See* OA Tr. 6:13-21 ("we are not contesting liability"), 39:11–19 (same)). Moreover, although the Court "may" reconsider its interlocutory decisions at any time before judgment "as justice requires," RCFC 54(b), factual evidence *only* justifies revisiting prior judgments when that evidence was "previously unavailable" to the parties. *Webster v. United States*, 93 Fed. Cl. 676, 679 (2010). The Parties have not shown they were unaware of OCSR's operation when Judge Firestone's 2020 opinion was issued, and the record indicates that OCSR's agreement with POTB is expressly incorporated in the trail use agreement and was therefore publicly available to both parties. (Def.'s Mot. at 20 ("2012 OCSR Agreement is also specifically incorporated into the Trail Use Agreement.")); *see also Loveridge IV*, at 71–72. ("The government has not presented any evidence that the POTB would not have abandoned rail service over the segment."; and "[t]he government has not identified 'any evidence at all affirmatively indicating that the railroad would have delayed abandonment . . .'"). And though Plaintiffs moved to reconsider Judge Firestone's 2020 decision, even that motion for reconsideration tellingly did not appraise Judge Firestone of OCSR agreement or its potential impact on liability. (*See* Pls.' Mot. for Reconsideration, ECF No. 119). Withholding those facts from Judge Firestone was tactically unsound and forecloses reconsideration now. *Gindes v. United States*, 740 F.2d 947, 949 (Fed. Cir. 1984) ("[N]o litigant deserves an opportunity to go over the same ground twice, hoping that the passage of time or changes in the composition of the court will provide a more favorable result the second time.") (internal citation and quotation omitted).

6

supporting arguments, that: (1) Plaintiffs have continued to access their properties since the NITU as they used to; (2) STIA, through both public statements and sworn testimony, indicated that there are no plans to cut off Plaintiffs' existing access; and (3) Plaintiffs have not produced evidence showing that the NITU has impacted their crossing access. (*Id*.). Plaintiffs concede the first point—that they have not been denied access or crossing rights. (Pls.' Cross-Mot. at 30). However, Plaintiffs ground their claim in the assertion that "there is nothing in place that guarantees [their] continued access and crossing rights." (*Id*. at 24). Plaintiffs point to a final concept plan produced by STIA that lays outs possible construction scenarios: either a rail-to-trail construction that will remove the existing rails and ties and replace the rail bed with the trail, or a rail-*with*-trail construction, with the trail adjacent to the existing rail bed, constructed on either the west or east side of the railbed. (*Id*. at 11). While STIA has taken no direct action initiating any of these projects, the trail use agreement specifically provides that STIA will construct the trail "in conformance with" the concept plan. (*Id*. at 13; Def.'s Mot. Ex. C).

From Plaintiffs' perspective, the construction of a trail as a rail-*with*-trail option "would result in significant damage to the Joslin and Jetty Fishery encroachments." (Pls.' Cross-Mot. at 18). For example, noting that the right-of-way covers the Joslin property's driveway, parking area, and 12 feet of the house, Plaintiffs assert that if STIA proceeds with building the trail on the west side of the railbed, "Joslin will lose his house." (*Id*. at 11–12). As to both parcels, Plaintiffs present that the property owners have attempted to negotiate with POTB to further secure or expand their access, but that the negotiations have not borne fruit because STIA, as the trail operator, controls the final decision. (*Id*.).

Plaintiffs warn of the same potential conflict with the Jetty Fishery parcel which is dual-use property. (*Id*. at 14). This residence, which also serves as an active marina and RV park for customers, has two crossings. (*Id*. at 12). One crossing is for customers of the Laviolette family business to reach the property to camp at the RV park or to get to the marina to fish, and the other pedestrian crossing is for Laviolette's access to their house. (*Id*.) While the house's deck is within the right-of-way, two related buildings are "either on the edge of the right-of-way or encroaching slightly," Plaintiffs claim. (*Id*.). Because the primary parking for the marina business is on the east side of the right-of-way while the RV park and marina are on the west side, the Plaintiffs contend that either of the Concept Plan's rails-*with*-trails options "will significantly damage," the property. (*Id*. at 12–13).

The United States' assurances that the NITU has not changed Plaintiffs' right to cross are speculative. For example, the United States argues that any future interim trail use will not "encumber any more surface than the railroad easement," nor will it present "any additional obstacles to crossing the corridor than the continuing easement." (Def.'s Mot. at 34). The United States also points to the language of the trail use agreement which preserves existing use agreements, and to testimony indicating that under the status quo, the Plaintiffs have not been denied access to their properties. (*Id*.). Plaintiffs do not dispute that CDJ and the Laviolette family at least have "preexisting encroachment agreements and crossing agreements," allowing both owners "to continue to use their property when the railroad actively operated on its right-of-way;" Plaintiffs also aver that the trail use agreement explicitly "dictates that crossing rights will continue in full force and effect." (Pls.' Cross-Mot. at 10, 25). Yet, Plaintiffs stress that the force of these guarantees is undermined by the trail use agreement's other provisions that give STIA

7

the right to object to existing agreements and specifically if they are not "in conformance with the Concept Plan." (*Id*. at 25).

Finally, the United States claims that because Oregon law provides a mechanism for obtaining continued access to landlocked properties, Plaintiffs are protected against any loss of crossing rights and, as result, should be denied damages now. (Def.'s Mot. at 35). Section 8(d) of the Trails Act, the United States argues, only preempts state law of abandonment and not other state laws, such as those protecting access and crossing rights. (*Id*.). In sum, the United States effectively believes that the appraisers must assume a trail will never be constructed while the Plaintiffs assert that the appraisers must assume the trail has already been constructed. (*See* Pls.' Cross-Mot. at 18). Both positions are self-servingly broad.

The United States' position that the Trails Act does not automatically vanquish the Plaintiffs' access rights under state law is supported by caselaw. *See e.g.*, *James v. United States*, 130 Fed. Cl. 707, 734 (2017) ("There is no support . . . in the Trails Act for plaintiffs' argument that, by operation of the Trails Act, plaintiffs lost their crossing rights [under state law] when the NITU was issued."). But a mere possibility of recourse to state law does not mean that Plaintiffs are barred, as a matter of law, from recovering crossing rights damages. Rather, this simply means that the harm Plaintiffs suffered is one characterized by the legal uncertainty of the future use of the right-of-way as opposed to any actual present deprivation. *See* 4A Nichols on Eminent Domain § 14A.02 ("The uncertainty is itself certain and if that uncertainty would influence a prospective buyer detrimentally, then the very existence of uncertainty may be an admissible fact that will permit recovery of damage."). Therefore, although the parties' experts may not testify as to how this uncertainty will be resolved in the future (whether the trail will be built or not, and in what form), they may testify as to how the uncertainty impacts market value. *United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1078 (5th Cir. 1996) (recognizing "the viability of claims for severance damages based on the likelihood that prospective buyers would fear hazards arising from  Government's use" of property) (collecting cases); *see also e.g.*, *Morale v. States*, 557 S.W.3d 569, 575 (Tex. 2018) (expert testimony is inadmissible when it "relates to 'remote, speculative, and conjectural uses' of the property," only to the extent that those uncertainties "are not reflected in the present market value of the property.") (citing *State v. Schmidt*, 867 S.W.2d 769, 773 (Tex. 1993)).

Plaintiffs correctly note that "there is nothing in place that indefinitely preserves" access and improvements as they exist today, (Pls.' Cross-Mot. at 17); the United States' mere promises—or rather, reliance on others' promises—does not close this factual gap. In takings cases, landowners are entitled to assume that the United States will make full use of all rights that it has taken, even if it is not exercising that right in the present. *See e.g.*, *2,953.5 Acres of Land v. United States*, 350 F.2d 356, 360 (5th Cir. 1965) ("The Government concedes, as it must, that the landowners are entitled to assume in the condemnation suit that the Government will make the full use physically possible of any easement" taken); *Cheshire Hunt v. United States,* 157 Fed. Cl. 101, 111 (Fed. Cl. 2022) (recognizing "the common sense understanding that an easement holder may use the entirety of the burdened property for the purpose of the easement."). The United States is free to disabuse landowners of that notion, but it must do so in accordance with principles of property law. Those principles mandate that if the United States wishes "to limit the exercise of its rights under the easement to its current use or to the prospective use envisaged by its expert," it should commit to that position through "formal

action," such as a deed, release, or otherwise. 5 Nichols on Eminent Domain § 16.01 (citing *Spinner v. State*, 4 A.D.2d 987, 167 N.Y.S.2d 731 (1957)); *see also Dana R. Hodges Trust v. United States*, 111 Fed. Cl. 452, 459 (2013) (denying crossing rights damages when rights were protected in "original recorded deeds" and therefore could not form basis for damages). The United States may limit the scope of its taking, but that limitation only has force if enshrined in an instrument that can be enforced against the United States. *United States v. 2,648.31 Acres of Land*, 218 F.2d 518, 523 (4th Cir. 1955) ("When the condemnor limits the use of its easement after the taking has occurred, this limitation can limit the damages recoverable, but only if the limitation is lawfully enforceable by the condemnee."); *Portland Natural Gas Transmission Sys. v. 19.2 Acres of Land*, 195 F. Supp. 2d 314, 322 (D. Mass. 2002) (finding that "[t]he taking authority is free to limit the scope of access either before the taking or, *with the landowner's agreement*, after the taking.") (emphasis added).

On the other hand, Plaintiffs also incorrectly assert that the appraisers must assume that the trails are already constructed. In *Boyer v. United States*, which also involved analysis of Oregon law, the Court concluded that appraisals should determine (1) "what a willing buyer would pay for the subject properties," (2) "whether such a buyer would be concerned about potential litigation over the right or location of access across the trail," and (3) "whether this concern would then translate to a diminution in the value of the property." 135 Fed. Cl. 121, 130 (2017). As in *Boyer*, expert appraisal shall not take as a given that "plaintiffs lost all crossing rights to their properties upon issuance of the NITU," but neither should it exclude the opportunity to show that a reasonable buyer's assessment of the market value may still be impacted by the possibility of that scenario occurring. *Id*. It is not difficult to imagine that a reasonable buyer can find the uncertainty surrounding the encroachments to impact the value of the properties, especially when STIA's concept plan itself magnifies this risk by specifically identifying the Jetty Fishery property as an area where building encroachments "may have *a substantial impact* on Trail Alignment and design." (Def.'s Mot. Ex. K at 34 (emphasis added)). A reasonable buyer however is equally likely to be influenced by any facts that can point to the low probability of a trail ever being constructed. Simply put, the trail use agreement, changed the otherwise guaranteed legal status of the Plaintiffs crossing rights, and Plaintiffs may be entitled to compensation if they can show that market value reflects the change.

Contrary to the United States' argument, recourse to state law in case of future conflict cannot absolve the United States of future use damages. Such a general rule cannot be endorsed because the ease of recourse to state law for recovery varies greatly from state to state; Plaintiffs assert that establishing an easement by necessity under Oregon law could be burdensome. (Pls.' Cross-Mot. at 25). It is the appraisers' task to determine if a reasonable buyer would be concerned about such potential loss and the difficulties of remedying it in a manner that is reflected in the market value of the properties. *See e.g.*, *Dana R. Hodges Trust*, 111 Fed. Cl. at 458–59 ("[I]f the limitations on any crossing rights to which the various Plaintiffs may be entitled by operation of state property law diminish the highest and best use of their lands . . . then such diminished value ought to be reflected in the parcels' appraisals in the 'after' condition"); *Moore v. United States*, 61 Fed. Cl. 73 (2004) (appraisal must ask "would a reasonable buyer be concerned about the potential loss of access across the Trail?"). Therefore, Plaintiffs position that the appraisals must assume that the trail is already built contorts the real-world conditions, as much as the United States' position does. Like in *Boyer*, the appraisal shall

9

not assume that the Plaintiffs have already lost their access but must not ignore the possibility that they might in the future. 135 Fed. Cl. at 130.

### C. Uncertainty about the Salmonberry Trail Project

The United States also argues that Plaintiffs are not entitled to damages for existing improvements or future development plans. (Def.'s Mot. at 37). Plaintiff OMI claims that the NITU agreement impacts its plans to construct a new path over the railroad corridor to its property; the United States retorts that there is no evidence that such improvements are limited by the terms of the NITU agreement or that OMI will be prevented from doing so. (*Id*.) The United States' argument is premised on a finding that the Trails Act allows landowners to share the trail use easement with the operator so long as landowners' use does not "materially interfere" with the interim trail use or a future rail use. (*Id.* at 37–41). The United States also argues that Plaintiffs have not provided evidence that their existing improvements or future developments would materially interfere with rail or trail use, and as such cannot incur damages. (*Id*.). In support, the United States relies on Plaintiffs' testimony that their parking or improvement use has not changed since the NITU. (*Id.* at 42). Because Plaintiffs have not been asked to leave the corridor by POTB, OCSR, or STIA, and because STIA testified that it has no concrete plans for proceeding with any trail projects, the United States purports that any claims about future loss are unsupported and speculative. (*Id.* at 42).

The United States insists that any appraisal must consider that, despite the agreement with STIA, no trail design plans have been finalized and no funding for trail construction has been approved. (*Id.* at 20). Plaintiffs, on the other hand, point to the Concept Plan developed in 2015 which lays out the potential designs for the Salmonberry Trail. (Pls.' Cross-Mot. at 25; Def.'s Mot. Ex. J). The United States responds that the layout is "a concept[,] . . . not reality," (Def.'s Mot. at 20), and buttresses that argument with the text of the Concept Plan which notes that the Concept Plan is to serve not as a "single solution," but as a "guide" for other agencies and advocate to "develop[] more specific plans and designs . . ." for trail use. (Def.'s Mot. Ex. J at 6). Furthermore, the United States relies on testimony from Lisa Sumption, the director of the Oregon Parks and Recreation Department and a co-convener of STIA, stating that STIA has not made a final determination as to the final layout of the trail and does not anticipate beginning construction until 2026 or while OCSR operates the scenic train. (Def.'s Mot. Ex. I at 41:14–42:17, 51:11–14, 69:16–70:1, 70:14–19). Ms. Sumption also testified that STIA does not have any current sources of funding for trail construction and that that in her opinion granting funding would be a "miracle." (*Id*. at 51:15-52:9, 58:11-16, 59:4-17, 63:21-64:9).[4]

---

[4] The United States also points the Court to a statement from Ms. Sumption: "…this could probably be not even in my lifetime by the time the trail is actually developed." (Def.'s Mot. Ex. I at 34:6-1). The Court is not concerned with the lifespan of any of the parties involved but instead with the *lifespan of the rights taken*. Ms. Sumption's testimony does not assuage all concern about a future conflict. *See Smith v. Tallahassee*, 191 So. 2d 446, 447–48 (Fla. 1966) (holding that mere informal privileges to use property in a certain manner cannot be used to reduce damages unless the owner is given a legally binding right to use the property in the

10

The United States' position that Plaintiffs are legally barred from recovering future use damages because there is no current interference with their present rights is unfounded. As the Court has previously stated, just compensation damages are viewed from the perspective of a reasonable buyer and any impact the taking might have on the fair market value of the property. *United States v. Va. Elec. & Power Co.*, 365 U.S. 624, 633 (1961) (quoting *Miller*, 317 U.S. at 374) (the standard for damages is "what a willing buyer would pay in cash to a willing seller"). Therefore, valuation at trial, not summary judgment, determines whether Plaintiffs' theory of injury would have an impact on how a reasonable buyer values the property, even if the "possibility of future conflict . . . is remote." *Balagna v. United States*, 138 Fed. Cl. 398 (2018).

The United States' insistence that it has effectively gained nothing from the transaction to date is immaterial. As Justice Holmes famously noted, in assessing takings damages, the question is "[n]ot, what the taker has gained[,]" but "[w]hat has the owner lost?" *Boston Chamber of Commerce v. Boston,* 217 U.S. 189, 195 (1910); *see also* The Yellow Book, § 4.6.3. Here, Plaintiffs lost whatever value could be assigned to their ability to market their properties to potential buyers as unencumbered and free of the easements imposed by the NITU for the next 99 years. (*See* Def.'s Mot. Ex. C at 5–6, §§ A(1)-(2), B (indicating that the trail use agreement leases the railroad corridor to STIA for a period of 99 years)); *see also Howard v. United States*, 106 Fed. Cl. 343, 368 (2012) ("When the STB issued the NITU, the possibility that plaintiffs' unencumbered right to their property would ever become a reality became hypothetical," and as a result, "for all practical purposes, [the United States] has encumbered plaintiffs' property rights in perpetuity."). Thus, the appraisers' task is to determine what that value is. They might conclude, as the United States claims, that the possibility of future conflict over crossing rights or improvements is so remote as to not be observable in comparable sales. Consequently, the Court denies the United States' motion to find that Plaintiffs are barred as a matter of law from recovering damages associated with future use and loss of improvements.

### III.   Conclusion

Therefore, the Court **GRANTS-IN-PART** and **DENIES-IN-PART** the United States' Motion for Partial Summary Judgment, (ECF No. 178), and **GRANTS-IN-PART** and **DENIES-IN-PART** Plaintiffs' Cross-Motion for Summary Judgment, (ECF No. 180). Specifically, the Court finds that:

---

manner contemplated); Joseph T. Waldo and Jeremy P. Hopkins, Eminent Domain and Land Valuation Litigation: the Claim of Severance Damages in Easement Takings (2004) ("A condemnor's non-binding promises to restrict its uses of the rights it takes will not reduce the damages to the property and should not be considered.") (collecting sources); *see also Cheshire Hunt*, 157 Fed. Cl. 111; 7 Nichols § 1B.06 (rev. 3d ed. 2002) ("Courts have overwhelmingly held that where the property owner does not accept the condemnor's promises or stipulations, those promises or stipulations are ineffective and do not modify what is taken or mitigate damages owed.").

(1) The legal instruction for expert appraisal may assume that in the "before" scenario the properties are burdened by the OCSR's scenic train until 2026 with potential for future extensions as stated in the trail use agreement.

(2) The legal instruction for expert appraisal may assume potential interference with crossing rights and loss of access and show the impact of any uncertainty over crossing rights on the properties' market values.

(3) The legal instruction for expert appraisal may assume potential loss of improvements and show the impact of any uncertainty over STIA's future exercise of its right on the properties' market value.

The Court **ORDERS** the Parties to meet and confer and submit a joint status report by **August 9, 2023**. The joint status report shall include the parties' proposed schedule for expert discovery, pretrial proceedings, as well as a trial date and location.

**IT IS SO ORDERED.**



s/     David A. Tapp
DAVID A. TAPP, Judge