# In the United States Court of Federal Claims

No. 16-912
Filed: November 26, 2024

---

**PERRY LOVERIDGE,** *et al.*,

                *Plaintiffs,*

**v.**

**THE UNITED STATES,**

                *Defendant.*

---

*Thomas S. Stewart* and *Reed W. Ripley*, Stewart, Wald & Smith, LLC, Kansas City, MO, for Plaintiffs.

*Kimberly A. Cullen* and *Leann Kim*, Trial Attorneys, *David A. Harrington*, Assistant Chief, *Todd Kim*, Assistant Attorney General, Environment and Natural Resources Division, United States Department of Justice, Washington, D.C., for Defendant.

## POST-TRIAL OPINION AND ORDER

**TAPP, Judge.**[1]

      When a plaintiff's burden of proof is undermined by unconvincing expert testimony, the Court is left in limbo, forced to wind a path between justice and the inadequacy of evidence. Ultimately, with no alternative, this culminates in a verdict of no damages.

      After establishing the government's liability for taking Plaintiffs' property, the Court proceeded to a valuation trial to determine just compensation. At trial, Plaintiffs bore the burden of proving that the fair market value of their land was less than its value under real-world conditions at the time of the taking. Plaintiffs did not meet their burden. Therefore, judgment shall be entered for the United States.

---

[1] The case was originally assigned to Judge Nancy B. Firestone and transferred to the undersigned on October 3, 2022. (*See* ECF No. 161).

I.  **Procedural History and Findings of Fact**[2]

The procedural and factual history of this rails-to-trails case is complex.[3] The subject railroad corridor in northwest Oregon primarily served freight transportation, including timber

---

[2] Insomuch as they are relevant, the Court adopts the findings in prior and related opinions. Because the Court's 2023 ruling on the parties' cross-motions for partial summary judgment, *Loveridge v. United States*, 167 Fed. Cl. 44 (Fed. Cl. 2023) ("*Loveridge VI*"), is integral to issues herein, its procedural history is included in this section.

[3] Because many of these filings are noted, this footnote serves as a reference point for all prior substantive opinions.

*Loveridge v. United States*, 139 Fed. Cl. 122 (2018) ("*Loveridge I*") (granting-in-part and denying-in-part cross-motions for partial summary judgment, holding that some deeds in question conveyed a fee interest title to the railroad whereas others only granted an easement), *aff'd sub nom. Albright v. United States*, 838 F. App'x 512 (Fed. Cir. 2020) ("*Albright*").

*Loveridge v. United States*, No. 16-1565L, 2019 WL 495578 (Fed. Cl. Feb. 8, 2019) ("*Loveridge II*") (granting-in-part Plaintiffs' RCFC 59(a)(1) motion, allowing for reconsideration of four (4) deeds), *aff'd sub nom. Albright*.

*Loveridge v. United States*, 148 Fed. Cl. 279 (2020) ("*Loveridge III*") (granting-in-part and denying-in-part cross-motions for partial summary judgment, holding that the alleged railbanking and interim trail use are outside the scope of some deeds but within the scope of others, thus granting broad easements to the Port of Tillamook Bay Railroad ("POTB")), *aff'd sub nom. Stimson Lumber Co. v. United States*, 82 F.4th 1346 (Fed. Cir. 2023) ("*Stimson Lumber*").

*Loveridge v. United States*, 149 Fed. Cl. 64 (2020) ("*Loveridge IV*") (granting-in-part and denying-in-part cross-motions for partial summary judgment, holding (1) that just compensation must be measured assuming subject properties were not encumbered by a rail easement because the evidence demonstrates that the POTB would have abandoned rail use but for the NITU; (2) without additional evidence, plaintiffs are only presumed to own up to the centerline of an "intervening" boundary to the railroad; and (3) where claimants could not produce instrument documenting their ownership, only easements were conveyed over certain disputed parcels, whereas fee interests were conveyed in others).

*Loveridge v. United States*, 150 Fed. Cl. 143 (2020) ("*Loveridge V*") (granting the government's cross-motion for summary judgment as to some disputed easements from *Loveridge III*, holding that takings were not effected because the railroad had not abandoned the easements for all purposes), *aff'd sub nom. Stimson Lumber*, 82 F.4th 1346.

from local logging operations. (Joint Stipulation of Facts ("JSOF") at 1–4, ECF No. 225; J.A. Tab 61, DX155; J.A. Tab 62, DX164).[4] The parties agree that the railroad obtained its right-of-way through the 1910 Wright-Blodgett Deed and the 1906 Byrom Deed. (*See* Trial Transcript[5] ("Tr.") Bradley, at 547:3–20; J.A. Tab 61, DX155; J.A. Tab 62, DX164; JSOF at 2, 4–5).



(J.A. Tab 8, JX10.4)

In December of 2007, a severe storm damaged the railroad tracks, rendering freight services impossible. *Loveridge v. United States*, 150 Fed. Cl. 143, 146 (2020) (the tracks "suffered catastrophic damage due to severe storms, making it impossible to provide service.")

---

*Albright v. United States*, 838 F. App'x 512 (Fed. Cir. 2020) ("*Albright*") (affirming holdings in *Loveridge I* and *II* that twenty-six (26) deeds in question conveyed fee simple absolute titles to the railroad), *cert. denied*, 142 S.Ct. 224 (2021).

*Loveridge VI*, 167 Fed. Cl. 44 (granting-in-part and denying-in-part cross-motions for partial summary judgment, holding that expert appraisal may assume (1) that the before scenario properties are burdened by real-world conditions, likely including the Oregon Coast Scenic Railroad's ("OCSR") scenic train until 2026 with potential for future extensions as stated in the trail use agreement; (2) potential interference with crossing rights and loss of access and show the impact of any uncertainty over crossing rights on the properties' market values; and (3) potential loss of improvements and show the impact of any uncertainty over Salmonberry Trail Intergovernmental Agency's ("STIA") future exercise of its right on the properties' market value).

*Stimson Lumber*, 82 F.4th 1346 (affirming holdings in *Loveridge III* and *V*, respectively, that railbanking and interim trail use are within the scope of the disputed deeds and that takings were not effected as the railroad had not abandoned easements for all purposes).

[4] The parties filed a Joint Appendix of Exhibits cited at trial. (ECF Nos. 244 (Ex. Nos. 1–35), 245 (Ex. Nos. 36–63)). These documents are consecutively tabbed and maintain their trial labels. For consistency, the Court identifies these documents by their tab number as labeled in the Joint Appendix and their exhibit number at trial. (J.A. Tab __, Exhibit No. [page number] (where specified)).

[5] The Trial Transcript consists of 980 pages and is separated into five volumes located at ECF Nos. 234 (pp. 1–30), 236 (pp. 31–316), 238 (pp. 317–541), 240 (pp. 542–837), and 242 (pp. 838–980). The Court cites the Trial Transcript using the name of the testifying witness, counsel, or the Court, then the consecutive pagination and line numbers, (Trial Tr. [NAME], at __: __).

("*Loveridge V*"). The damage forced the railroad to halt freight operations; due to the cost of repairs, the Court previously found this cessation to indicate the railroad's intention to abandon the line.[6] *Id.* (finding that the railroad's statement that it "does not believe that it will be able to obtain the necessary funding to repair and rehabilitate the line" qualified as an intention to abandon service); (*see also* Trial Tr. Bradley, at 560:1–14, 583:10–584:9). Even with financial aid to repair the damaged tracks, local officials determined that continuing freight operations was unwise. (Trial Tr. Bradley, at 612:2–5 ("FEMA gave us the option to repair it. We said, Mother Nature clearly doesn't like it up there. We'll take the funds and do things on the industrial park instead.")).

This produced a mixed impact on adjacent lands; while the storm damaged much of the railroad, some sections remained intact, including those near Plaintiffs' properties. (J.A. Tab 46, JX55). In May 2016, the Port of Tillamook Bay Railroad ("POTB") gave formal notice of its intent to partially abandon the rail line located between Milepost 775.01 near Washington County, Oregon, and milepost 856.06, near Tillamook County, Oregon—a distance of 87.01 miles. (JSOF at 1). Thereafter, Salmonberry Trail Intergovernmental Agency ("STIA") requested a Notice of Interim Trail Use ("NITU") for the railway corridor and the Surface Transportation Board ("STB") approved that request. (*Id.*). On October 23, 2017, POTB and STIA jointly executed a Railbanking Agreement and then the Salmonberry Trail Rail Line Lease Agreement the following year. (*Id.* at 2).

Plaintiffs' properties were burdened by the original railroad easement and subsequently by the NITU. *See Loveridge v. United States*, 139 Fed. Cl. 122, 129–130 (2018) ("*Loveridge I*") (docketed at ECF No. 54). Two of these remaining parcels are located in Rockaway Beach, Oregon, and are owned by Camp Double J, LLC, and the Jetty Fishery. (JSOF at 4; J.A. Tab 53, PX13.A). Camp Double J, LLC owns 4.57 acres (sometimes referred to during trial as "the Joslin parcels") and the Jetty Fishery owns 4.48 acres (sometimes referred to during trial as "the Laviolette parcels"). (JSOF at 4). The third property, a 45.56-acre tract near Garibaldi, Oregon, is owned by Old Mill Investment. (JSOF at 5; J.A. Tab 53, PX13.A).[7] The easement encroaches on each of the parcels, (JSOF at 2–6), engendering the possibility that any realized recreational trail will destroy or impair improvements and crossing rights for each property.

The factual scenario from this point deviates from typical rails-to-trails litigation. As explained below, two novel issues mar what would otherwise be a straightforward analysis: (1) the fact that any recreational trail contemplated by the STIA is unlikely to materialize, and (2) the continued robust operation of a scenic passenger train along the "abandoned" rail line.

---

[6] Though not discussed at trial, some portions of the rail line were undamaged, resulting in the termination of all rail services for much of the line, but leaving other portions unharmed including those portions abutting Plaintiffs' properties. (J.A. Tab 46, JX55.5).

[7] Originally, this litigation involved 132 deeds. *See Loveridge I*, 139 Fed. Cl. at 129. The three claimants' parcels described above are all that remain.

A.    *A Trail Plan Unrealized*

The proposed trail would cover a twenty-three-mile segment of the rail line adjacent to Plaintiffs' properties. (Trial Tr. Sumption, at 386:16–18, 395:19–396:9; J.A. Tab 43, JX49.4–5 §§ A(1); J.A. Tab 47, JX56). In 2015, prior to issuance of the NITU, the STIA published a concept plan for the trail, exploring both rail-to-trail and rail-with-trail options. (J.A. Tab 46, JX55; Trial Tr. Sumption, at 381:2–11 (explaining that a "rail-to-trail" would entail "taking the rail out and creating a trail" and a "rail-with-trail" would entail "leaving the rail in place and aligning the trail somewhere close by.")). The concept plan emphasized the preliminary nature of its cost estimates, acknowledging that they were based on best-guess assumptions and may vary significantly from actual construction costs. (J.A. Tab 46, JX55.24). The plan also indicated that constructing the trail could take decades. (*Id*.; Trial Tr. Sumption, at 369:20–370:19). A subsequent planning document, titled the Parametrix Report, specifically addressed the coastal segment. (J.A. Tab 59, DX73-CC). Despite various planning efforts over the years, no trail plan has been approved to date. (Trial Tr. Sumption, at 361:8–22). Depending on the design, early cost estimates ranged from $46 million to $139 million. (*Id*. at 387:21–25). Current construction costs could be significantly higher, potentially reaching 50% more than the plan's initial estimates. (*Id*. at 388:3–11, 18–21). Crucial to the Court's analysis, funding for trail construction remains a significant obstacle. (*Id*. at 383:24–384:4).

The future of the proposed trail is uncertain, with construction years away, if ever. (Trial Tr. Sumption, at 363:2–12, 385:5–23, 417:19–24). The prospect of funding is also unknown. (*Id*. at 416:16–22). Despite eight years passing without meaningful development, Plaintiffs maintain that a trail could still be built based on the existence of the NITU, however, testimony and circumstances establish that the probability is unlikely.

B.    *The Scenic Train*[8]

If a rail-with-trail plan were implemented, the concept plan anticipated the continued operation of a scenic train, the Oregon Coast Scenic Railroad ("OCSR"). (J.A. Tab 46, JX55.24).

---

[8] As discussed herein, this scenic train is a pre-existing contract transferring an easement that would not extinguish with or without a trail easement. (*See* JX52.1; Trial Tr. Bradley, 571:6–19, 579:18–580:15 (indicating that POTB's understanding was that OCSR would continue its passenger service even if a rails-to-trails agreement was reached, with no plans to terminate OCSR); *id*. at 571:20–572:2 (indicating POTB also intended OCSR to continue running trains on POTB's railroad if no rails-to-trails agreement was reached)). Its existence plagues this case as the parties failed to inform the Court of the existence of the operational passenger train during the liability determination stage. Plaintiffs argue that Judge Firestone's reliance on *Toscano v. United States*, 107 Fed. Cl. 179 (2012), is an indication that she knew about OCSR in the liability phase. (Pls.' Post-Trial Br. at 9–12). Deduction is not enough. The parties have not since moved to revisit this issue and, for efficiency purposes, the Court declines to do so today. The Court has determined that the before condition would likely include the operation of the scenic train, as it is a real-world factor affecting the property's value. *See Loveridge VI*. As discussed further, this significantly impacts the Court's final ruling.

Adding to the case's intricacies, OCSR continues to operate along the "abandoned" rail line. OCSR is a nonprofit scenic, passenger train service operating between Tillamook and Enright since 2006. (JSOF at 6). OCSR is a popular seasonal tourist attraction in Oregon, with ridership exceeding 18,000 passengers in 2012 and increasing to 55,000 in 2023. (J.A. Tab 46, JX55.10; Trial Tr. Sumption, at 372:3–10; Trial Tr. Bradley, at 564:17:20, 630:13–21). OCSR's ongoing lease and use of the rail line, along with its positive impact on the local community, demonstrate its value and continued viability. (Trial Tr. Bradley, at 578:20–579:17, 580:16–582:19).



(J.A. Tab 59, DX73-Y.20

OCSR does not conduct freight service. (Trial Tr. Aldridge, at 630:20-21). Unlike freight services, OCSR's mission is to educate the public about the historical logging railroad right-of-way. (Trial Tr. Sumption, at 360:4–15; Trial Tr. Bradley, at 559:2–29; Trial Tr. Aldridge, at 620:20–24). The scenic train travels north and south along the corridor, giving passengers views of Plaintiffs' properties and homes. (Trial Tr. Aldridge, at 630:20–21, 647:9–649:7; Trial Tr. Joslin, at 74:14–17, 74:18–75:19 (stating that some renters on the affected parcels found the train to be "big and [] scary and noisy," and that "it impacts privacy."), Trial Tr. S. Laviolette, at 146:15–19). OCSR has a long-term lease agreement with the POTB to use the rail line and a 100-foot right-of-way until 2026. (JSOF at 6–7; Trial Tr. Bradley, at 563:9–22, 578:9–13).

As part of the agreement with POTB, OCSR is responsible for maintaining the railway corridor. (J.A. Tab 44, JX51.4, JX51.19–22; Trial Tr. Bradley, at 565:9–12; Trial Tr. Aldridge, at 631:19–633:21). This is accomplished by "replac[ing] tires, replac[ing] joint bars, fill[ing] ballast, keep[ing] . . . signals in working order" and conducting track inspections. (Trial Tr. Aldridge, at 632:5–9). OCSR is also permitted to allow third parties to run other recreational railroad vehicles, such as rail riders and speeders. (Tr. Trial Bradley, at 565:23–566:4, 608:24–611:6).

While the current lease between OCSR and POTB is set to expire in approximately two years, the parties are negotiating for renewal. (Trial Tr. Bradley, at 578:20–23l, 582:14–20; Trial Tr. Aldridge, at 658:20–23; Trial Tr. Sumption, at 394:4–7). Testimony indicates that continuation of OCSR via one or more subsequent leases is likely. While this is based on a variety of factors, it is noteworthy that OCSR is a source of significant revenue for POTB, and OCSR's ridership and revenue are increasing. (Trial Tr. Bradley, at 580:16–581:5; Trial Tr. Aldridge, at 645:13–646:9; Trial Tr. Sumption, at 372:2–9). POTB receives 12.5% of OCSR's gross revenue, approximately $100,000 annually. (Trial Tr. Bradley, at 580:19–581:11). Further, during a pre-trial site visit, the Court observed new construction related to the POTB/OCSR arrangement. (Trial Tr. Colloquy, 510:15–18). Although the future of the scenic train is somewhat uncertain, it will likely continue to serve the Tillamook County community for years to come. (Trial Tr. Bradley, at 578:20–579:17, 581:9–582:19; Trial Tr. Aldridge, at 658:22–

659:11; Trial Tr. Sumption, at 372:19–25). In the meantime, OCSR and POTB continue to invest in improving the existing rail line. (Trial Tr. Colloquy, at 510:15–18, 511:1–10).

Based on these facts, it is likely that a prospective, reasonable buyer would account for the scenic train when configuring an offer to purchase the affected party. While the parties dispute the frequency with which OCSR serves its 55,000 passengers, there is no dispute that OCSR continues to impact the privacy of the Plaintiffs. (Trial Tr. Colloquy, at 663:13–665:6; Trial Tr. Bradley, at 590:24–591:16, 607:13–609:1). Concerning the Old Mill property, the executive director of OCSR confirmed that its operations (trains, charters, maintenance runs) travel in both northern and southern directions from the Old Mill property. (Trial Tr. Aldridge, at 647:9–649:7). Passengers riding the scenic train can see the properties and homes as the train passes by. (Trial Tr. Joslin, at 74:14–17; Trial Tr. S. Laviolette, at 146:15–19). In testifying as to the privacy concerns posed by OCSR's operation by the properties, Mr. Joslin testified that some who have previously rented his property had found the train to be "big and [] scary and noisy," and that "it impacts privacy." (Trial Tr. Joslin, at 74:18–75:19). For a prospective buyer to ignore the implications of a scenic train is nonsensical.

Neither party nor their experts deny that the scenic train's continued operation after the NITU is an anomaly. (Trial Tr. Colloquy, at 509:2–10 (Plaintiffs' expert acknowledging that in his 50 years as an appraiser, he has never encountered a scenario involving the continued operation of a scenic railroad following a NITU); Trial Tr. Hasson, at 791:3–4 ("I would say having a railroad still operating is unusual"); Trial Tr. Matthews, at 463:20–23 ("To analyze I assume OCSR's existing scenic rail easement is unique and was not extinguished. Definitely is unique. I've done lots of these properties, and I've never seen this before."); Trial Tr. Colloquy, at 487:8–20 (describing discussions with 10 additional appraisers, none of whom had encountered like situations involving continued operation of scenic railway following NITU)). This novel issue is the source of complications in calculating the value of just compensation for two reasons; first, the parties failed to disclose the existence of OCSR in the liability phase of this litigation, and second, an easement continuing to exist in real-world conditions impacts property value.

i.    The Parties' Failure to Disclose OCSR

While the POTB has not operated freight rail traffic since 2007, its continued support for OCSR's passenger service contradicts the idea of abandonment. (Trial Tr. Bradley, at 568:1–24). On August 13, 2018, the Court determined liability, finding that each of the three remaining Plaintiffs was subject to a taking; it did so without knowledge of the existence of the scenic train. *See generally Loveridge I*. The parties failed to disclose the operational passenger train during the liability phase. The Court has since inquired about the parties' rationale multiple times:

> Court:    At what point prior to June 22nd, 2020, did either party ever let Judge Firestone know about the existence of this scenic excursion trail?
>
> U.S. Counsel: From my review—well, I won't take this as a copout, but I was not the trial counsel at that time, but from my review of

> the docket, I don't believe it was brought up in any briefing explicitly before that point.

(Summ. J. Hr'g Tr. Colloquy, at 14:1–3, ECF 191).

> Court:        You cite back to Judge Firestone's opinion that POTB would have abandoned its easement. Again, that decision was colored—is colored—by the fact you guys didn't tell her about OCSR. There's no dispute of that, right?
>
> Pls.' Counsel: That's right, Your Honor. We just didn't view it as relevant.

(Mot. in Lim. Hr'g Tr. Colloquy, at 73:7–15, ECF No. 229). During summary judgment briefing, the United States asserted:

> At that time, we were still in the liability phase, Your Honor, and we had many parcels over this 81-mile stretch of railroad, and not all of them are affected by the scenic railroad issue. It's just a small portion. So I would guess that when making [] argument, [former] counsel was perhaps focused on, you know, a larger issue and making a different argument about whether or not inconsistent uses abandoned the easement. It just hadn't perhaps crystallized as clearly.

(Summ. J. Hr'g Tr. at 17:5–13). Though Plaintiffs have explained this justification various times, (Pls.' Resp. to Mot. for Partial Summ. J. at 24, ECF No. 180 (arguing that fault was the government's error of omission); Mot. in Lim. Hr'g Tr. at 73:18–19 ("[O]ur view is that that was the Government's to rebut at that point.")), any purported justification remains uncompelling.

That the Court was unaware of OCSR's existence at a time when it mattered to legal analysis gives the Court considerable pause. Following the close of evidence at trial, the Court concluded:

> [N]ow that all the proof is in, I have an incontrovertible fact, which Judge Firestone did not have, which is that the scenic rail was in operation on the same rail corridor prior to and after the issuance of the NITU. I think I've indicated multiple times how uncomfortable I am with the fact that Judge Firestone did not have the benefit of that knowledge, because I certainly think it impacts the decision of whether there was a taking to begin with.

(Trial Tr. Colloquy, at 963:23–964:6; *see also* Mot. in Lim. Hr'g Tr. Colloquy at 85:17–18). The existence of OCSR may have altered the liability outcome. Later in *Loveridge V*, the Court acknowledged that POTB "had entered into third party contracts," which granted third parties, presumably OCSR, "limited non-ownership rights to use or access the easements." 150 Fed. Cl. at 150. The Court elaborated that "[t]hese existing use agreements between the POTB and third parties suggest that the POTB intended to retain (and continues to retain) an interest in the easements," prior to the trail use agreement, and subsequently determined that conduct inconsistent with an intent to abandon. *Id.* ("For these reasons, the court concludes that the

plaintiffs have failed to demonstrate under Oregon law that the POTB abandoned the broad easements at issue in these motions."). However, the parties have not since moved to revisit this issue, and, for efficiency purposes, the Court declines to do so today. (*See* Trial Tr. Colloquy, at 964:12).[9]

    ii.  *Loveridge VI:* OCSR in the "Before" Condition

   The operation of a passenger train on a supposedly abandoned railway corridor is a novel circumstance, unlikely to be repeated in rails-to-trails jurisprudence. The Court previously ruled on the parties' motions for partial summary judgment as to how to instruct experts on the "before" and "after" conditions as they relate to the OCSR. *See Loveridge v. United States*, 167 Fed. Cl. 44 (Fed. Cl. 2023) ("*Loveridge VI*").

   Based on the atypical nature of OCSR's easement, no binding precedent indicates whether and to what degree it should be considered in land valuation. The United States previously argued that the before condition should include the actively operating scenic train. (Summ. J. Hr'g Tr at 6:6-12 (including the scenic train in the before condition "adheres to the well-settled precedent from the Federal Circuit," and that Plaintiffs "are not entitled to windfall.")). Plaintiffs disagreed, arguing that the OCSR train should be excluded from the before condition because, as a matter of law, appraisers must assess the before condition as if the property is "vacant." *Loveridge VI*, 167 Fed. Cl. at 48 (citing Pls.' Cross-Mot. for Summ. J. at 8).

   Relying largely on *Rasmuson v. United States*, 807 F.3d 1343 (Fed. Cir. 2015), the Court found that "damages must be calculated utilizing the real-world conditions of a property" which may include the "pre-existing contract to operate a local scenic train" on the same rail line. *Loveridge VI*, 167 Fed. Cl. at 46. The Court ordered that legal instruction for expert appraisal may "assume that in the 'before' scenario the properties are burdened by the OCSR's scenic train[.]" *Id*. at 55.

---

[9] Plaintiffs moved for reconsideration of the opinion on liability but did not address the status of OCSR's existence or operation. (ECF No. 55; *see also* Summ. J. Hr'g Tr. 14:24-15:3, ECF 191). The United States, while never formally requesting a reconsideration, suggested that the Court revisit the earlier liability decision *sua sponte* in the context of a summary judgment motion. (Def.'s Mot for Part Summ. J. at 32, ECF No. 178). The United States argued that the Court could apply the "justice requires" standard of RCFC 54(b) because OCSR's agreement with POTB was a "real-world condition" that became clear during discovery. (Summ. J. Hr'g Tr. at 9:13–21). RCFC 54(b) instructs that a court may revise a non-final partial judgment (*i.e.*, an interlocutory order) at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties. *Curtiss-Wright Corp. v. General Elec. Co.*, 446 U.S. 1, 5–8 (1980). A judge has significant discretion under Rule 54(b) to reconsider non-final decisions "as justice requires." *E&I Global Energy Services, Inc., v. United States*, 152 Fed. Cl. 524, 532 (2021). The OCSR agreement was publicly available throughout litigation; thus, the Court found the procedural issues arising from the parties' agreed-upon discovery process did not warrant reconsideration pursuant to RCFC 54(b).

The Court "decline[d] to impose its own metric on the [p]arties' experts," noting that doing so without "the benefit of context best provided at trial," would be inadvisable. *Loveridge VI*, 167 Fed. Cl. at 46. The Court emphasized that given the fact-intensive nature of the parties' disagreements "a final determination regarding admissibility and the weight of such expert testimony must await" trial. *Id*. at 46. This was to afford Plaintiffs the opportunity to show that the real-world conditions, including OCSR, did not affect Plaintiffs' property rights or that a reasonable buyer would not consider its existence when establishing fair market value.

C.    *Testimony as to Just Compensation*

At trial, the parties offer competing theories to calculate just compensation. The United States' distilled approach results in zero damages, based on the arguments that: (1) a railroad operated before and after the NITU; (2) the recreational trail will not be constructed; and (3) consequently, Plaintiffs have lost nothing. (Def.'s Post-Trial Br. at 24–25, ECF No. 246 (no difference in the value of properties between before and after scenarios)).

Plaintiffs argue for a valuation based on a fully realized recreational trail in its most damaging configuration, assuming a complete loss of all encroaching improvements and crossing rights.[10] (*See generally* Pls.' Post-Trial Brief, ECF No. 243). As explained below, Plaintiffs request $1,003,000 in total:

|  | **Joslin** | **Jetty Fishery** | **Old Mill** |
|---|---|---|---|
| BEFORE VALUE | $468,000 ($248,000 in land value after considering OCSR's use, $220,000 in improvement value) | $899,000 ($445,000 in land value accounting for OCSR's use, $454,000 in improvement value) | $3,417,000 (land value only, no improvements) |
| AFTER VALUE | $139,000 (all land value, improvements considered taken) | $430,000 ($236,000 in land value, $194,000 in improvement value after considering house, business, and shop taken) | $3,212,000 (land value only, no improvements taken) |

---

[10] The affected improvements and access are admittedly numerous—including crossing rights, a deck, portions of a home, a business office, a shop, a repair facility, and a commercial parking lot. (*See e.g.*, Trial Tr. Matthews at 228:20–233:3, 236:15–237:21; Trial Tr. D. Laviolette, at 163–166.)

| DIFFERENCE<br><br>(Plaintiffs' proposed just compensation) | **$329,000** ($109,000 in land, $220,000 in improvements) | **$469,000** ($209,000 in land, $260,000 in improvements) | **$205,000** ($83,000 in land value, $122,000 damages to the remainder for loss of highway frontage, and change in highest and best use) |
|---|---|---|---|

(*See* Pls.' Post-Trial Br. at 31 (citing J.A. Tab 50, PX11.B (Old Mill); J.A. Tab 51, PX11.C (Jetty Fishery); J.A. Tab 52 PX11.D (Joslin))).

The numerical values assigned to the takings by the experts diverge broadly. For Camp Double J (the Joslin properties), Plaintiffs valued the before condition at $468,000; the after condition at $139,000, for a diminution value of $329,000. (J.A. Tab 52, PX11.D.55). The United States assessed the before and after condition as identical, $268,000, meaning no diminution in value resulted from the taking. (J.A. Tab 56, DX03.0007). For the Jetty Fishery, Plaintiffs valued the before condition at $899,000; the after condition at $430,000, for a diminution in value of $469,000. (J.A. Tab 51, PX11.C.58). The United States' approach results again in no diminution in value ($268,000 in the before and after conditions), and therefore no taking. (J.A. Tab 55. DX02.0007). Lastly, for the Old Mill property, Plaintiffs value the before condition at $3,417,000, and the after condition at $3,212,000, for a diminution in value of $205,000. (J.A. Tab 50, PX11.B.17, 27). The United States initially adopted the same zero-sum approach, assessing the before and after conditions for the two parcels comprising the Old Mill property as identical at $4,151,000.[11] (J.A. Tab 54, DX01.0006).

Plaintiffs' expert, Mr. David Matthews, a seasoned appraiser, faced challenges in valuing the before condition.[12] At trial, when queried about the condition of the property *prior* to the NITU, Mr. Matthews claimed he accounted for OCSR's presence. (Trial Tr. Matthews, at 326:11–16 ("[U]sing the judge's orders, that there is a scenic railroad easement on the property, before and after.")). That declaration is not supported.[13] Mr. Matthews's failure to reference

---

[11] Following a correction, the United States increased its initial assessment to $4,276,620 and left its after valuation identical, for a total loss of $125,620. (J.A. Tab 53, PX13.A.42).

[12] Plaintiffs bill Mr. Matthews as "the most experienced and knowledgeable Rails-to-Trails appraiser in the country." (Pls.' Post-Trial Br. at 2, ECF 243). Plaintiffs utilized a rebuttal expert, Mr. John Kilpatrick, at trial. (J.A. Tab 53, PX13.A). His wholesale adoption of Mr. Matthew's opinions, while ignoring apparent flaws, did not independently support Mr. Matthew's credibility.

[13] The Court finds the Government's cross-examination of Mr. Matthews on this point particularly persuasive. (Trial Tr. Matthews, at 424:8–24, 425:2–6, 425:25–427:12). Aside from the inconsistencies revealed on cross-examination, Mr. Matthews's responses during direct examination about how he accounted for OCSR in the before condition raised doubts, maintaining that the scenic train's effect was "de minimus." (*Id*. at 326:20–25). Later, on cross,

OCSR in the report about the extraordinary presence of an operational scenic train along the same corridor is not plausible:

> COURT:    Counsel, may I ask? I may have missed something. You asked him if he took my order into account in his opinions. Can you tell me where in the report you're referring to that you see that?

> COUNSEL:  It's not in the report, Your Honor. He just testified to how he considered that, and he concluded that it was -- the presence of OCSR was a de minimis issue in the -- in this appraisal.

> COURT:    Yeah, I think I misspoke. It's my apologies. So I thought I understood him to say he took into account my determination that the scenic railway was running in the before condition. And when I'm looking under ordinary assumptions, I don't see that. Did I just miss a reference to a different part of the report?

> COUNSEL:  No, Your Honor. That conclusion is -- he just testified to that he considered it and didn't include it, and for the reason why.

> COURT:    Am I missing where that's explained in the report?

> COUNSEL:  It's not in the report, Your Honor.

(Trial Tr. Colloquy, at 327:15–328:11 (referencing Trial Tr. Matthews, at 424:8–24)).

The contrary supposition that Mr. Matthews did not account for OCSR in the before situation ignores OCSR's reality.[14] Notably, this was not the sole omission from Mr. Matthews's

---

he attempted again to explain the absence of his reasoning from his report was justified by the "de minimus" frequency of OCSR's operation. (*Id*. at 428:9-22). To be clear, that explanation is unconvincing. Plaintiffs' rebuttal expert. Dr. John Kilpatrick, adopted a similar approach, declaring that in the before and after condition, "the irregular and seasonal use by a scenic railroad has little or no impact on the utility of the property or the property's value." (J.A. Tab 53, PX13.A.4). For similar reasons, the Court does not accept Plaintiffs' characterization of OCSR's operation or its effect.

[14] As the United States correctly notes, Mr. Matthews formulated his opinion prior to the Court's determination and did not update those figures to account for OCSR. (Def.'s Post-Trial Br. at 31; *see also e.g*., J.A. Tab 51, PX11C.51). Moreover, while he claimed at trial that he did account for OCSR's operation in the before condition, the Court is unconvinced. Nothing in his report supports that claim. (Trial Tr. Matthews, at 326:10–328:13, 424:13–425:8, 425:12–426:8). The Court rejects the idea that an expert with the wealth of experience attributed to Mr. Matthews would entirely omit such a significant consideration from his report especially given that only months prior to his deposition he believed that OCSR did not burden the Old Mill property. (*See id*. at 426:16–427:11).

written documentation.[15] These circumstances rendered Mr. Matthews's valuation of the before condition improbable despite protestations otherwise.

Plaintiffs further posit that the passage of time between the issuance of a NITU and trail construction is irrelevant to calculating damages. (Trial Tr. Colloquy, at 506:15–507:7). Plaintiffs' rebuttal expert, also armed with decades of experience involving rails-to-trails valuations, could not recall an instance where a landowner received full value for a permanent taking when a trail had not been constructed. (Trial Tr. Kilpatrick, at 959:7–12).

The United States instructed its expert, Ms. Stacy Hasson, who had limited experience in rails-to-trails litigation but is an otherwise seasoned appraiser, that the OCSR had been operating both before and after the NITU's implementation and that the easement covered the entire 100-foot railway corridor. (Def.'s Post-Trial Br. at 25; J.A. Tab 54, DX1.29–31). Given the Court's rulings in *Loveridge VI*, Ms. Hasson's reliance on these instructions, (*see* J.A. Tab 63, DX179.20-23; J.A. Tab 48, JX58 § 1.2.7.1; Trial Tr. Hasson, at 694:16–700:14), as to the before condition is appropriate and her conclusions are credible.

Ms. Hasson also ran into difficulties appraising the after condition and adopted an alternative approach to valuation. (*See, e.g.*, J.A. Tab 54, DX1 (Ms. Hasson's Old Mill Appraisal Report); J.A. Tab 55, DX2 (Ms. Hasson's Jean C. & Shirley J. Laviolette Appraisal Report); J.A. Tab 56, DX3 (Ms. Hasson's Joslin appraisal report)). Ultimately, Ms. Hasson identified five properties affected by the railway easement and concluded that this easement added value to these properties. (Trail Tr. Hasson, at 727:2–11; J.A. Tab 54, DX1.74–76; J.A. Tab 55, DX2.73–75; J.A. Tab 56, DX3.72-74). Ms. Hasson also concluded that a recreational trial offered no additional burden following the NITU. (Trial Tr. Hasson, at 726:14–24, 750:20–751:3, 817:22–818:1, 854:18–855:2; J.A. Tab 54, DX1.134–35; J.A. Tab 55, DX2.103–04; J.A. Tab 56, DX3.101–02). Ms. Hasson's after valuation involved listening to other witnesses, looking for similar comparable properties in the same geographical vicinity, considering the feasibility of discounting future income, and reaching out to an appraisal library for helpful information. (Trial Tr. Hasson, at 756:8–757:15). Ultimately, she was unsuccessful in identifying more than a single "comparable"—i.e., property with similar zoning, use, characteristics, and a railway easement. (*Id.*, at 716:20–23).

Ms. Hasson's evaluation of the potential trail development along the NITU had a minimal impact on her property valuation due to a lack of comparable properties with similar uncertainties. (Trial Tr. Hasson, at 757:16–24). Accordingly, she determined that the uncertainty resulting from the issuance of the NITU and an as-of-yet unrealized (and maybe never-to-be recreational trail) was too speculative. (*Id.* at 760:21–761:6). Ms. Hasson's conclusions as to the after condition lack credibility. Specifically, Ms. Hasson's approach to valuation ignores a

---

[15] Mr. Matthews also omitted justification of a "five percent" impact on Plaintiffs' property values arising from being adjacent to a railroad, (Trial Tr. Matthews, at 495:19–497:7), though he later explained his analysis might be contained within his work files. (*Id.*, at 497:8–499:9). Again, the Court does not credit such a calculation that is neither included within an expert's report nor sufficiently explained within the testimony.

buyer's consideration of the uncertainty that a standalone trail, or rails-with-trail, may still result in the decades to come.

In most cases, determining the before and after conditions is relatively straightforward; this case presents a unique challenge due to the ongoing operation of the scenic passenger train and the uncertainty surrounding the recreational trail. The Court finds that both sets of calculations are problematic and that both parties' methodology is compromised.

## II.    Conclusions of Law

The complexity of the conditions created by OCSR, combined with the parties' failure to disclose the operational passenger train during the liability phase, make it challenging to accurately value the taking. It is Plaintiffs' burden to show that the existence of OCSR in the before condition would not affect the fair market value of the property. They have not carried their burden.

Where a taking has been established, property owners bear "the burden of proving an actual loss has occurred" to determine just compensation. *Otay Mesa Prop*., *L.P. v. United States*, 779 F.3d 1315, 1323 (Fed. Cir. 2015). Landowners bear the burden of establishing the value of the railway corridor. *Hyatt v. United States*, 170 Fed. Cl. 417, 432 (2024) (internal citations omitted). Property owners meet this burden if they show actual damages "with reasonable certainty." *Ind*. *Mich*. *Power Co*. *v. United States*, 422 F.3d 1369, 1373 (Fed. Cir. 2005). This "requires more than a guess, but less than absolute exactness." *Precision Pine & Timber*, *Inc*. *v. United States*, 596 F.3d 817, 833 (Fed. Cir. 2010).

The Federal Circuit has held that traditional compensation methods are not exclusive; for example, there may be appropriate alternative valuation methods for the taking of an easement. *See Vaizburd v. United States*, 384 F.3d 1278, 1285–87 (Fed. Cir. 2004); *see also Yaist v. United States*, 17 Cl. Ct. 246, 257 (1989) ("[t]he court may use its judgment in selecting the method to determine fair market value."). In ruling on the disputes over valuation standards in takings cases, the Court is cognizant of the guiding principle that "just compensation should be carefully tailored to the circumstances of each particular case." *Otay Mesa Prop*., *L.P. v. United States*, 670 F.3d 1358, 1368 (Fed. Cir. 2012). The Court seeks "the full monetary equivalent" of the property interest taken to ensure that property owners receive just compensation under the Fifth Amendment. *Almota Farmers Elevator & Whse*. *Co*. *v. United States*, 409 U.S. 470, 473–74 (1973). In doing so, the Court considers the concept of "compensation." Historically, the Supreme Court of the United States has provided some direction:

> The noun 'compensation,' standing by itself, carries the idea of an equivalent. Thus we speak of damages by way of compensation, or compensatory damages, as distinguished from punitive or exemplary damages; the former being the equivalent for the injury done, and the latter imposed by way of punishment. So that, if the adjective 'just' had been omitted, and the provision was simply that property should not be taken without compensation, the natural import of the language would be that the compensation should be the equivalent of the property. And this is made emphatic by the adjective 'just.' There can, in view of the combination of

those two words, be no doubt that the compensation must be a full and perfect equivalent for the property taken….

*Monongahela v. United States*, 148 U.S. 312, 326 (1893).

Just compensation includes a specific range of damages. In addition to the value of the property taken, just compensation encompasses severance damages which are the diminution in value of the owner's remaining property resulting from the taking. *United States v. Miller*, 317 U.S. 369, 376 (1943) ("[i]f only a portion of a single tract is taken, the owner's compensation for that taking includes any element of value arising out of the relation of the part taken to the entire track."). The Court's polestar in assessing damages is the fair market value of what property owners have lost. *Otay Mesa*, 670 F.3d at 1369 ("[w]hile diminution in value is a useful methodology in many cases, we reiterate that the focus of the damages analysis must always remain on awarding just compensation for what has been taken.").

In permanent takings, fair market value is defined as the price that a willing buyer would have paid a willing seller, with both having reasonable knowledge of the relevant facts. *United States v. Cartwright*, 411 U.S. 546, 551 (1973). Because a hypothetical willing buyer could consider both existing and potential future uses for the property, fair market value takes into consideration "the highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future." *Olson v. United States*, 292 U.S. 246, 255 (1934). The ultimate determination of just compensation is informed by expert testimony and experts' analysis of comparable sales. *Wash. Metro. Area Transit. Auth. v. United States*, 54 Fed. Cl. 20, 28 (2002) ("[e]xpert testimony ordinarily is essential in setting the minuend and subtrahend of this equation, often informed by the analysis of sales involving comparable parcels.").

As the Supreme Court has acknowledged, the quantification of just compensation can be a complex endeavor and is not subject to a rigid formulaic approach. *See United States v. Commodities Trading Corp*., 339 U.S. 121, 123 (1950) ("This Court has never attempted to prescribe a rigid rule for what is 'just compensation' under all circumstances and in all cases."); *United States v. Toronto, Hamilton & Buffalo Navigation Co*., 338 U.S. 396, 402 (1949) ("Perhaps no warning has been more repeated than that the determination of value cannot be reduced to inexorable rules."); *United States v. Cors*, 337 U.S. 325, 332 (1949). The Supreme Court has characterized the damages analysis as "a guess, as well informed as possible, as to what the equivalent would probably have been had a voluntary exchange taken place." *Kimball Laundry Co. v. United States*, 338 U.S. 1, 6 (1949). This "guess" is based in large part on expert testimony. As Justice William Curtis Bok of the Pennsylvania Supreme Court famously noted expert opinion "is only an ordinary guess in evening clothes." *Earl M. Kerstetter, Inc. v. Commonwealth*, 404 Pa. 168, 173, 171 A.2d 163, 165 (1961).

In *Moore v. United States*, 54 Fed. Cl. 747, 749 (2002), the Court held that "fair market value of the entire affected parcel [is determined] as if the easement did not exist and then another determination in light of the taking." This Court has expounded on this to say that the before and after calculation requires "a determination of the fair market value of the entire affected parcel as if the easement did not exist and then another determination in light of the

taking." *Illig v. United States*, 58 Fed. Cl. 619, 624 (2003) (citing *Moore*, 54 Fed. Cl. at 749)). The facts of this case evince that it is not amenable to such a straightforward calculation.

### A.    The "*Before*" Condition

In rails-to-trails cases, the most used mechanism is the before-and-after method of assessing damages where just compensation equals the difference in market value of the land before and after the easement is imposed. *Otay Mesa*, 670 F.3d at 1364 (quoting *United States v. Va. Elec. & Power Co.*, 365 U.S. 624, 632 (1961)). To do this, one calculates damages by establishing the fair market value of the property absent any easement on the date of the taking— whereby the before value is the value of the entire fee unencumbered. *See e.g.*, *Ladd v. United States*, 110 Fed. Cl. 10, 13 (2013) (Court looks to "the value of plaintiffs' land . . . without easements – unencumbered property"); *Rogers v. United States*, 101 Fed. Cl. 287, 296 (2011) ("[T]he 'before' condition of the property . . . was the unencumbered fee simple[] Plaintiffs would have enjoyed . . . absent the taking.").

The Court has previously found that the source deeds did not convey railbanking and trail use easement. *Loveridge v. United States*, 148 Fed. Cl. 279 (2020) (*Loveridge III*). Based on these facts alone, the Court found that Plaintiffs were entitled to just compensation for a taking that superimposed "a railbanking and trail use easement" on their lands. *Loveridge v. United States*, 149 Fed. Cl. 64 (2020) ("*Loveridge IV*"). With liability already determined, this Court went on to rule that the parties may instruct experts on the existence of the scenic train; that testimony would be subject to the weight of evidence at trial. *See generally Loveridge VI*; *see also Nicholson v. United States*, 170 Fed. Cl. 399, 412 (2024) ("just compensation is largely fact–dependent and varies between each case; it does not do to impose legal prohibitions on fact-intensive issues."); *United States v. 564.54 Acres of Land*, 441 U.S. 506, 509, n.3 (1979) (denying motion in limine to exclude damages evidence because "a complete factual record should be developed from which an independent determination of the appropriate measure of compensation can be made.").

Plaintiffs would like the Court to ignore the existence of the OCSR and its corresponding agreements. With the benefit of a site visit, testimony, and the introduction of evidence, Plaintiffs again argue that the Court's earlier reliance on *Rasmuson* is misplaced because *Rasmuson* "exclusively focused on certain aspects of the taken property's physical condition, not its legal condition," and that absent the NITU, OCSR's "legal right to occupy and use," the easement corridor would have extinguished. (Pls.' Post-Trial Br. at 26). The Court previously rejected this argument because "nothing in the language of *Rasmuson* itself points to this distinction," and OCSR's operation is both a physical reality and a legal reality detached from the NITU. *Loveridge VI*, 167 Fed. Cl. at 48–49 (noting that POTB expressly preserved its legal obligation to OCSR throughout the NITU process). Considering the entire record before it, the Court concludes that to disregard this reality is to overlook the thousands who annually utilize the train as a means of experiencing the coastal communities of northwest Oregon. The Court declines to accept the "legal condition" loophole fashioned by Plaintiffs.

The Court concludes that including OCSR in the before condition is essential to accurately value the affected properties. A core precept of just compensation is that the public should not compensate property owners for anything more than what they have lost. *Bauman v.*

*Ross*, 167 U.S. 548, 574 (1897) (noting that an owner "is entitled to receive the value of what he has been deprived of," and "to award him more would be unjust to the public."). Here, OCSR operated before the NITU, continues to operate, and would operate in any conceivable circumstance. The Court concludes that excluding OCSR from the before condition would artificially inflate the properties' before-value and compensate Plaintiffs beyond what was actually taken. *Va. Elec.*, 365 U.S. at 633 (citation omitted); *see also Almota Farmers Elevator & Warehouse Co.*, 409 U.S. at 473–74 ("The owner is to be put in the same position monetarily as he would have occupied if his property had not been taken.") (citation omitted). The facts established at trial only solidify the Court's prior findings. The Court declines Plaintiffs' invitation to conceptualize a hypothetical scenario in which a locomotive carrying thousands of tourists annually does not exist, thereby artificially enhancing their potential recovery.

The reality Plaintiffs face is that OCSR's agreement would not extinguish with or without a trail easement; the future of the trail or the railroad makes no difference to OCSR until at least 2026 and likely for lease periods thereafter. (*See* J.A. Tab 45, JX52.1; Trial Tr. Bradley, at 571:6–19, 579:18–580:15 (indicating that POTB's understanding was that OCSR would continue its passenger service even if a rails-to-trails agreement was reached, with no plans to terminate OCSR); *id.*, at 571:20–572:2 (indicating POTB also intended OCSR to continue running trains on POTB's railroad if no rails-to-trails agreement was reached)). Stated another way, Plaintiffs' land would be "shared" in any feasible condition. Consequently, for the interim period preceding the NITU, the properties "belonged" both to OCSR, by virtue of its legal right of use, and to Plaintiffs in their capacity as property owners along the rail corridor. Were the Court to disregard the OCSR/POTB contract, thereby excluding OCSR's operation in the before condition, Plaintiffs would be compensated for a value they never solely owned. To prevent this unjust enrichment, the Court concludes that OCSR's operation must be part of the before condition.

Given that OCSR's continued operation on the supposedly abandoned rail line is fixed, the Court must now evaluate its impact on the property values both before and after the potential trail easement. The scope and implications of that easement are contested.

i.    OCSR's Scope of Use

The parties disagree on how the scope of OCSR's easement should be measured and defined. The United States argues that POTB granted OCSR the right to use both POTB's rail line and the full 100-foot right-of-way under the OCSR Agreement. (Def.'s Post-Trial Br. at 9–10). That agreement references OCSR's obtaining the right to use—in addition to the "POTB's rail line"—POTB's "right-of-way." (*See* J.A. Tab 44, JX51.1. ¶ 6–7, JX51.2–3 § 2(A)). Exhibit A to the agreement is labeled as "Description of Right-of-Way," and notes a 100-foot right-of-way for both mileposts 835.417 to 839.12, and 842.6 to 856.18. (J.A. Tab 55, JX51). In contrast, language in the concept plan and the Final Plan Report supports Plaintiffs' argument that OCSR's operation needs are limited to the 17-foot boundary around the rail line. (*See e.g.*, J.A. Tab 46, JX55.23 ("OCSR stated that a six-foot separation from center line of the rail to the safety fence eight feet from the center line to the edge of trail would be needed for adequate clearance for all rail equipment"); Pls.' Post-Trial Br. at 19 ("Mr. Matthews concluded that a width of 17 feet was appropriate based primarily on the Final Plan Report and his own extensive experience with railroad corridors." (citing Trial Tr., at 221:8–24, 222:6–223:13))).

Regardless of the language of the OCSR agreement and the concept plans, OCSR's actual use of the right-of-way is broad and aligns with the supposition promoted by the United States: "We use our maintenance equipment. We use areas like that for storing things. And then we also tend to utilize it for our general operations." (Trial Tr. Aldridge, at 630:4–11). OCSR's museum operations and activities may entail the use of the right-of-way space beyond the rail line, which includes using OCSR's "rolling stock as museum pieces," so that "stationary items that are parked either on siding tracks in the right-of-way or pieces that may be off its tracks and in the right-of-way," are available for "people . . . to go and view those." (*Id*. at 631:10–17). Furthermore, during the site visit, the Court took note of the ongoing construction activities along a substantial expanse of the railroad corridor proximate to the Old Mill property. (*See* Trial Tr. Colloquy, at 510:15–18). In sum, the Court cannot rely on an unenforceable concept plan while OCSR enjoys the reality of an enforceable contract.

This testimony and observation are unassailable; OCSR utilizes, with the consent of POTB, far more than the narrow seventeen-foot swath urged by the Plaintiffs. Its use is consistent with the written "Description of Right-of-Way." (J.A. Tab 44, JX 51.1. ¶ 6–7, JX51.2–3 § 2(A)). Consequently, the Court concludes that the written agreement accurately represents OCSR's right of use to the full 100-foot right-of-way.

ii.    POTB's Freight Easement

The United States incorrectly assumes that including OCSR's operation in the before condition also requires including POTB's original railroad easement. (*See* Def.'s Post-Trial Br. at 16 ("Under . . . this Court's summary judgment order, the before condition includes . . . the continued existence of POTB's original railroad easement.")). The Court held that, for the limited purpose of calculating damages, the parties' experts may consider OCSR's active operation so that damage calculations conform with *Rasmuson*. *Loveridge VI*, 167 Fed. Cl. at 48. Stated differently, the Court found that the real-world conditions for this property may encompass the scenic train. Based on this finding, the United States deduces that POTB's original railroad easement, including its common carrier use, must also be included in the before condition. This suggested approach mischaracterizes the Court's summary judgment opinion as well as the landscape of case law.[16] The Court did not, as the United States would suggest, determine whether POTB's original railroad easement should be included in the before condition as a matter of law. (*See* Def.'s Mot. for Part. Summ. J. at 17 ("the baseline 'before' valuation must appraise Plaintiffs' parcels burdened by *an operating* railroad.") (emphasis in original), ECF No. 178); *see also Loveridge VI*, 167 Fed. Cl. at 50 ("the Court agrees that base valuation must find the parcels burdened by *the operating scenic railroad . . .*") (emphasis added).

In its Post-Trial Brief, the United States argues that because "POTB is using its railroad by leasing the right-of-way to OCSR," then "POTB's easement would have persisted through the continued use granted to OCSR . . . ." (Def.'s Post-Trial Br. at 18). The United States supports this argument by citing Oregon's abandonment law. (*See id*. ("Oregon law requires "non-use" of

---

[16] The Court's opinion was exclusively concerned with addressing the unavoidable fact of OCSR's continued operation. *See generally Loveridge VI.*

the easement and "either a verbal expression of an intent to abandon or conduct inconsistent with an intention to make further use" of the easement.")). The application of state abandonment law to the specific facts of this case is fundamentally a matter of liability—a matter that should have been presented proximate to *Loveridge IV*.

The Court finds that this argument is the government's veiled attempt to relitigate liability in the absence of a motion to reconsider. *See Caldwell v. United States*, 391 F.3d 1226, 1236 (Fed. Cir. 2004) (considering state law reversionary interests to find liability), holding modified by *Hardy v. United States*, 965 F.3d 1338 (Fed. Cir. 2020). As stated above, the Court declines to do so. Such an action directly contravenes the United States' repeated assurances to preserve the liability determination. (Def.'s Reply, ECF No. 181 at 14 ("The United States is not contesting liability . . . ."); (Summ. J. Hr'g Tr. at 6:17–18 ("We are not contesting liability. We are not using just compensation as a workaround from the liability finding.")). It is evident that including POTB's railroad's easement, i.e., freight operation, in the before condition would eliminate any real difference between before and after values and render minimal, if not zero, damages in almost every case; this proposition is inconsistent with established case law and is inequitable. *See Ark. Game & Fish Comm'n v. United States*, 568 U.S. 23, 33 (2012) ("Once the government's actions have worked a taking of property, 'no subsequent action by the government can relieve it of the duty to provide compensation[.]'").

The United States' argument also counters this Court's well-established practice. In the case of a permanent taking in the rails-to-trails context, the Court often establishes the fair market value of the property absent any easement on the date of the taking. *See Ladd*, 110 Fed. Cl. at 13 (The court looks to "the value of plaintiffs' land . . . without easements—unencumbered property"); *Rogers*, 101 Fed. Cl. at 296 ("[T]he 'before' condition of the property . . . was the unencumbered fee simple[ ] Plaintiffs would have enjoyed . . . absent the taking."). "In other words, the [C]ourt starts with the value of the property assuming that, but for the issuance of the NITU, the former easement for railroad use would have been extinguished." *Balagna v. United States*, 138 Fed. Cl. 398, 404 (2018). This is because by the time a Court gets to valuation, liability has been established and it is presumed that the railroad would have abandoned; meaning what was "taken" equates to the total fee, absent extenuating circumstances. *See id*. While this case presents a unique set of challenges, the United States does not distinguish this case from other cases where liability has already been established.

Furthermore, the United States is incorrect to argue "that there is no factual or legal basis for" segmenting the easements given the Court's finding that OCSR's operation should be included in the before condition. (Def.'s Post-Trial Br. at 18–19). As the United States previously argued, the real-world conditions of the property inform the damage assessment. (*See* Def.'s Mot. for Partial Sum. J. at 17 (before condition "could not ignore the real-world condition of the property."), 32 ("It would be contrary to justice to overlook the real-world situation.")). The parties were aware of OCSR's operation prior to summary judgment briefing but failed to inform the Court for *years*. The Court will not now condone the United States' waiver of this significant issue; the mere fact that it is advantageous for the United States to raise this issue now does not excuse its previous silence.

In arguing for a departure from the Court's liability decision regarding the composition of the before condition, the United States conveniently overlooks a critical factual finding: although

the railroad tracks remain suitable for OCSR's passenger train service, POTB contends that they are irreparably damaged for common carrier service. *See Loveridge IV*, 149 Fed. Cl. at 64, 71–2. As the Court noted, POTB's notice of intent to abandon expressly provided: "POTB does not believe that it will be able to obtain the necessary funding to repair and rehabilitate the line," from what POTB characterized as "catastrophic damage." *Id*. at 71 ("It is [] undisputed that the Notice indicated that the POTB would not be able to repair damage to the railroad line . . . .").

The United States rightly argued the Court should consider real-world conditions as a factor in valuation proceedings. The same reasoning requires that the real-world condition that POTB's freight carrier service be excluded from the before condition. POTB could not have used the easement for that purpose, though passenger service remains not only a possibility but a reality. (*See* J.A. Tab 45, JX52.1). The facts at trial further support this finding. There has been no revenue from freight traffic on the line since 2007. (Trial Tr. Bradley, at 583:10–584:9). The Court also gives weight to the railroad operator's decision not to pursue repairs. (*Id*.,65483 at 612:2–5 ("FEMA gave us the option to repair it. We said, Mother Nature clearly doesn't like it up there. We'll take the funds and do things on the industrial park instead.")). The Court credits that freight service became an effective impossibility after a December 2007 storm:

> And so that December of 2007 storm left huge landslides, totally destroyed where the rail was. There's chunks where bridges were hanging — hanging rail and things like that up in the middle. Up toward the top there's about a 200-foot landslide where the rail went with it down into the canyon.

(*Id*. at 611:7–25).

To the extent that the Court's earlier finding rests on determinations that the parties now dispute, the parties cannot rest silently, hoping to qualify those findings years later. *Gindes v. United States*, 740 F.2d 947, 949 (Fed. Cir. 1984) ("[N]o litigant deserves an opportunity to go over the same ground twice, hoping that the passage of time or changes in the composition of the court will provide a more favorable result the second time.") (internal citation and quotation omitted). The trial evidence is unequivocal: freight and passenger operations were severed following the devasting storm of 2007.

Based on the Court's adherence to the real-world conditions of the properties for evaluating damages, POTB's freight easement is excluded from the before condition. *See Ladd v. United States*, 630 F.3d 1015, 1023 (Fed. Cir. 2010) ("A taking occurs when state law reversionary property interests are blocked . . . . The NITU is the government action that prevents the landowners from possession of their property unencumbered by the easement." (citations omitted)); *Ybanez v. United States*, 102 Fed. Cl. 82, 87 (2011) ("The determination of what was taken from plaintiffs turns not on the status of the land at the time of the NITU but what interest plaintiffs would have had in the absence of the NITU."); *Raulerson v. United States*, 99 Fed. Cl. 9, 12 (2011) ("Contrary to defendant's position, the extent of the taking depends not on plaintiffs' property interests at the time of the NITU, but rather upon the nature of the state-created property interest that petitioners would have enjoyed absent the federal action and upon the extent that the federal action burdened that interest." (quotation omitted)). Upon consideration of the evidence presented at trial, the Court finds that POTB's freight easement does not accurately reflect the conditions prevailing on the property. Absent such an

extraordinary circumstance, the inclusion of the POTB rail easement in the baseline condition is not consistent with established legal precedent.

      B.   *The "After" Condition*

     In a takings context, valuing the after condition looks to the market value of the remainder of the property after the government's acquisition. Interagency Land Acquisition Conference, Uniform Appraisal Standards or Federal Land Acquisitions (6th ed. 2016) ("Yellow Book") at 49 (citing *Va. Elec.*, 365 U.S. at 632; *United States v. 68.94 Acres of Land*, 918 F.2d 389, 393 n.3 (3d Cir. 1990); *United States v. 91.90 Acres of Land in Monroe Cnty. (Cannon Dam)*, 586 F.2d 79, 86 (8th Cir. 1978); *Ga.-Pac. Corp. v. United States*, 640 F.2d 328, 336 (Ct. Cl. 1980) (*per curiam*)) (J.A. Tab 48, JX58). The after condition, therefore, centers on any diminution in the value of plaintiffs' property that resulted from the taking. However, the Court must consider that valuation is dependent on physical, legal, and economic practicability. Yellow Book at 156 (citing *Sharpe v. United States*, 112 F. 893, 897 (3d Cir. 1902), aff'd sub nom. *Sharp v. United States*, 191 U.S. 341 (1903) (discussing insufficiency of evidence of "possibilities more or less remote")). Given the anomalous circumstances, the determination of the after condition is also a complex inquiry. Specifically, the existence of OCSR and the potential impact of trail construction raise questions that mirror many of those associated with the before condition.

       i.   <u>OCSR</u>

     As established, OCSR currently has a contract with POTB to operate the scenic train until 2026. (J.A. Tab 44, JX51; Trial Tr. Bradley, at 563:9–22, 578:9–13). The Court previously found that while OCSR's operation may be included in the before condition, the impact of OCSR's operation going into the future is a fact-dependent inquiry and that "[e]valuating the exact extent of that impact awaits trial." *Loveridge VI*, 167 Fed. Cl. at 50. The Court now has the benefit of testimony regarding uncertain future events.

     The current OCSR lease ends in 2026. POTB and OCSR are negotiating a renewal. (Trial Tr. Bradley, at 578:20–23l, 582:14–20; Trial Tr. Aldridge, at 658:20–23; Trial Tr. Sumption, at 394:4–7). OCSR constitutes a significant source of revenue for POTB, and its ridership and revenue are experiencing growth. (Trial Tr. Bradley, at 580:16–581:5; Tr. Aldridge, at 645:13–646:9; Tr. Sumption, at 372:2–9). OCSR also maintains the rail line by "replac[ing] tires, replac[ing] joint bars, fill[ing] ballast, keep[ing] . . . signals in working order" and conducting track inspections. (Trial Tr. Aldridge, at 632:5–9). Moreover, OCSR is currently engaged in the expansion of the rail line. No evidence has been presented to indicate that OCSR's continued viability is compromised. Based on the testimony presented, the Court concludes that the continuation of OCSR's operations through one or more subsequent leases is probable.

       ii.   <u>Trail Use Easement</u>

     Other judges of this Court have held that, in the after condition of rails-to-trails cases, appraisers are to assume that the hiking and biking trail is in place and has been constructed. *Hardy v. United States*, 141 Fed. Cl. 1, 10 (2018). This Court does not dispute the appropriateness of such an approach in many cases; however, it has been established that the

present case does not fall within the category of "most cases." Based on the combination of uncommon factors, the United States has convincingly argued that the after condition should not assume a trail is already constructed. That is because "almost eight years after the NITU issued, STIA has not created a public trail, no trail is under construction, no design has been selected, and no funding is available." (Def.'s Post-Trial Br. at 10). As there "will not be [a trail] for the foreseeable future," the Plaintiffs should not be compensated for the diminishment of land value based on the existence of an imaginary trail. (*Id.*). While the Court agrees that it should not presume the construction of a trail post NITU, neither can it disregard the possibility of such construction and its potential negative impact on market value.

As this applies to property value, the Court considers Plaintiffs' highest and best use of the property. "To be a property's highest and best use, the use must be (1) physically possible; (2) legally permissible; [and] (3) financially feasible," and "must result in the highest value." Yellow Book at 23. In dealing with "a thorny issue of valuation" the Court must investigate to what extent expert opinions are grounded in operative fact. Plaintiffs maintain that the market value in the after condition should be premised on the assumption that the trail manager's project is already constructed—and in the manner that imposes maximal depreciation of the Plaintiffs' property values. As Mr. Matthews opined,

> In this case, the notice of interim trail use, NITU. And that freezes time July 26, 2016. So everything is done as of that date. What is the market doing as that date? What's the buyers' and the sellers' attitudes? What do you know at that date? You can't really go past that date.

(Trial Tr. Matthews, at 233:8–14; 483:20–25).

The Court agrees, in part, that the issuance of the NITU is not an entirely dispositive factor in a takings analysis. Certain post-NITU events may be relevant to the inquiry. *See e.g.*, *Caquelin v. United States*, 959 F.3d 1360 (Fed. Cir. 2020) (compensable temporary taking occurred despite expiration of NITU with no trail use agreement resulting). It is through post-NITU events, for example, that temporary takings occur. *See Independence Park Apartments v. United States*, 465 F.3d 1308, 1312 (Fed. Cir. 2006) ("When subsequent action converts an otherwise permanent taking into a temporary one, just compensation is typically calculated in the same manner, adjusted to account for the subsequent events so that the damages will accurately reflect the value of what was taken.") (internal citations omitted).

Applying Plaintiffs' preference, suggesting that the NITU freezes time and that damages must be calculated without regard to subsequent events, is a convenient but unrealistic approach, particularly here. *See Cooley v. United States*, 324 F.3d 1297, 1305–06 (Fed. Cir. 2003) (recognizing that agency decision to reverse course could convert permanent takings to temporary one). The notion that the date of the NITU serves as a temporal checkpoint does not align with Mr. Matthews' testimony: "[m]aybe you can use a sale a year or something like that afterwards, maybe even more . . . ." (Trial Tr. Matthews, at 233:23–25); *see also United States v. 63.04 Acres of Land*, *Lido Beach*, *Town of Hempstead*, *Nassau County*, *State of N.Y.*, 245 F.2d 140, 145 (2d Cir. 1957) (no "absolute rule" precludes consideration of subsequent sales as comparables).

22

Aligning neatly with the theory that time ceases upon the issuance of the NITU, Plaintiffs' rebuttal expert testified that for appraisal purposes, property owners have lost all marketable title on the date of the NITU, and any occasional ancillary occupation of the property is incidental to the loss of such marketable title. (Trial Tr. Kilpatrick, at 903:19–904:2). Notably, Plaintiffs did not present expert testimony from a real estate attorney or title examiner about how the property's title being marketable affects its value. Nevertheless, when questioned regarding the significance of a trail's construction, Dr. Kilpatrick maintained the position that the factual circumstances pertaining to the actual commencement of the project were irrelevant:

> To think about road widening for just a second, you know, real simple eminent domain taking that every appraiser is trained to evaluate, the highway department comes along and says they need to take my front yard because they're going to widen the road. I lose my front yard. I lose my marketable title to my front yard the day they take it. It may take them a year or two or three down the road for them to actually widen the road, but once they've taken my front yard, I've lost marketable title to it.

(*Id*., at 904:6–15).

Adopting the same logic, Plaintiffs assert that "[t]he [Court of Federal Claims] has followed this logic for decades to find landowners are entitled to compensation for 100 percent of the value of the land taken," in the after condition.[17] (Pls.' Post-Trial Br. at 30). That assertion is partially correct, but such a rigid approach does not fit with the idea of *just* compensation.

Under fundamental constitutional law, private property may not be seized for public use "without just compensation." U.S. CONST. amend. V. Notably, the right to compensation is qualified by the term "just," defined by Black's Law Dictionary as being "legally right; lawful; equitable." JUST, Black's Law Dictionary (12th ed. 2024) (last reviewed November 19, 2024). This principle has been subject to inquiry by other courts for many years:

> Thus, the only standard of compensation mandated by the Constitution is that it be 'just,' which in turn evokes ideas of 'fairness' and 'equity[.]' But what is just, fair, and equitable? To begin with, the Supreme Court has made clear that in the condemnation context, as in all areas of the law, justice is not

---

[17] Plaintiffs rely on an out-of-context statement from *Jackson v. United States*, 155 Fed. Cl. 689, 702 (2021), that courts in rails-to-trails cases have "consistently held that the owners of land subject to a trail easement retain virtually no rights in the encumbered land and awarded the plaintiffs the fee simple value of the encumbered parcel." Judge Williams was not articulating a legal principle but instead discussing commonality for the *facts* of a rails to trails case to show a complete loss of value. This is clear from Judge Williams' own holding about plaintiffs' loss of value in that case which was "[b]ased upon the record as a whole," and not as a matter of law. *Id*., at 702. Plaintiffs have not cited a single analogous case in which the Court has presumed that landowners forfeit the entirety of their property value when factual disputes pertain to the extent of the trail project.

> measured from the jaundiced perspective of either the individual alone or the collectivity alone: 'Just compensation means a compensation that would be just in regard to the public, as well as in regard to the individual.' Giving yet more content to the concept of just compensation, the Court has explained that the underlying principle is that the dispossessed owner 'is entitled to be put in as good a position pecuniarily as if his property had not been taken. He must be made whole but is not entitled to more.'

*United States v. 320.0 Acres of Land*, 605 F.2d 762, 780–81 (5th Cir. 1979) (internal citations and quotes omitted).

Just compensation in most cases means "the fair market value of the property on the date it is appropriated." *Kirby Forest Indus. v. United States*, 467 U.S. 1, 10 (1984). But the Supreme Court has cautioned that "other measures" should be employed "when market value is too difficult to find, or when its application would result in manifest injustice to owner or public." *Id.* at 10 n.14 (quoting *Commodities Trading Corp.*, 339 U.S. at 123). That is because, at the end of the day, "[t]he constitutional requirement of just compensation derives as much content from the basic equitable principles of fairness . . . as it does from technical concepts of property law." *United States v. Fuller*, 409 U.S. 488, 490 (1973) (citing *Commodities Trading Corp.*, 339 U.S. at 124)).

Multiple factors affect the calculation of the after condition of Plaintiffs' properties, including the prominent fact that existence (and/or creation) of an actual trail is slim. The concept plan was characterized as a general and intended to stimulate further discussion, rather than a finalized action plan. Given the complexity of the trail, no single solution was proposed, and instead, advocates and agencies were encouraged to utilize the concept plan as a guide for developing more specific plans and designs for various segments of the trail. (Trial Tr. Sumption, at 368:20–22; J.A. Tab 46, JX55.5). STIA held "public open house meetings," to discuss both plans and it received public commentary including "over 29,000 reviews of the planning website and thousands of comments." (Trial Tr. Sumption, at 371:1–12; 361:23–362:1; 380:8–10). From the initial discussions of the trail, planners made clear that the trail would likely take years, even decades, to complete. (J.A. Tab 46, JX55.5). Even one of the property owners characterized the trail plan as "somebody's pipe dream." (Trial Tr. S. Laviolette, at 153:3–4).

Since these preliminary meetings, the realization of a trail has stalled. Ms. Sumption, co-convener of the STIA, elaborated on the impediments to progress:

> We'd have to have funding. We'd have to have community engagement. We'd have to work with the local jurisdictions around what we can do from a planning perspective. We'd have to go back and reassess the trail. A lot has happened on there just with Mother Nature and those types of things. So there — a whole new plan would need to be developed.

(Trial Tr. Sumption, at 384:11–21; *see also id.*, 385:6–22; 382:20–25, 384:11–21). In 2017, the coastal segment was projected to cost between $46 million (for rail-to-trail) and $139 million (for rail-with-trail). (*Id.*, at 387:20–24; J.A. Tab 47, JX56.104). Hypothetically, if construction could somehow commence, costs for the trail now are likely 50 percent higher. (*Id.*, 388:2–20).

In sum, no mechanism for financing the substantial construction costs has been identified that would make the existence of a trail a likely scenario. Numerous other complications exist, the least of which is OCSR's continued operation—other stakeholders, engineering complexities, and coordination with local jurisdictions are also issues to consider. (*Id.*, at 384:15–20, 390:2–7; *see also* J.A. Tab 47, JX56.107–12, 104–08).

Against this backdrop, Plaintiffs' expert relied on the concept plan outlining potential trail layouts and designs, as well as a limited number of emails, to assume the construction of a trail in the most detrimental configuration. (Trial Tr. Matthews, at 230:21–231:25, 481:20–482:6). In balancing the evidence indicating the uncertainty of trail construction against the evidence offered by Plaintiffs, the Court draws two conclusions. First, the construction of the trail is improbable. Second, such an uncertainty does not absolve the United States from its obligation to provide just compensation for the property taken. Stated differently, while the Court finds that the after condition should not contemplate a fully realized trail, this determination is not dispositive.

iii.    Crossing Rights, Improvements, and Trail Location

The parties disagree as to the appropriate method for measuring the loss of crossing rights or potential interference with improvements within the right-of-way. The Court determines that neither Oregon law nor the Trails Act mandates that such an easement must be exclusive and, accordingly, that Plaintiffs failed to satisfy their burden of establishing the loss of crossing rights and property encroachments.

Plaintiffs rely on cases to argue that "[a]s a matter of law" the Court should assume that property owners lose the full value of their encroaching improvements as a result of the NITU. (*See* Pl.'s Post-Trial Br., at 33–36 (discussing *Agapion v. United States*, 167 Fed. Cl. 761 (2023))). The reach of these decisions is circumscribed; all are post-trial opinions examining the actual use of the easements and potential interference with the planned trail. In *Agapion*, for example, the Court noted the trail manager's testimony that encroachments "might be removed in the future if they do interfere with the trail." 167 Fed. Cl. at 769; *see also Childers v. United States*, 112 Fed. Cl. 617, 648 (2013) ("the Court finds that, *based on the evidence as informed by the site visit*, the trail impacts the entire remainder of properties of less than 25 acres, and the trail substantially impacts the remainder of larger properties.") (emphasis added).

The Court has previously addressed this issue:

> The United States' position that the Trails Act does not automatically vanquish the Plaintiffs' access rights under state law is supported by caselaw. But a mere possibility of recourse to state law does not mean that Plaintiffs are barred, as a matter of law, from recovering crossing rights damages. Rather, this simply means that the harm Plaintiffs suffered is one characterized by the legal uncertainty of the future use of the right-of-way as opposed to any actual present deprivation. Therefore, although the parties' experts may not testify as to how this uncertainty will be resolved in the future (whether the trail will be built or not, and in what form), they may testify as to how the uncertainty impacts market value.

…

> [The] expert appraisal shall not take as a given that plaintiffs lost all crossing
> rights to their properties upon issuance of the NITU, but neither should it
> exclude the opportunity to show that a reasonable buyer's assessment of the
> market value may still be impacted by the possibility of that scenario
> occurring.

*Loveridge VI*, 167 Fed. Cl. at 52 (internal citations and quotes omitted). As this Court signaled, it is the *uncertainty* regarding the loss of crossing rights that must be evaluated at trial. *See Dana R. Hodges Trust v. United States*, 111 Fed. Cl. 452, 459 (2013) (rejecting argument that trail easement eliminated crossing rights); *Schulenburg v. United States*, 139 Fed. Cl. 716, 719 (2018) (concluding that crossing rights are "well established" under state law, and "run with, the land."). The insistence that crossing rights automatically extinguish upon the issuance of a NITU neither aligns with appropriate case law nor the Court's direction.

Oregon state law holds that easement grantors "retain[] full . . . use of the land subject to an easement," unless their use interferes with "the fair enjoyment of the easement," or unless "extrinsic evidence," or "the written document itself expressly and unequivocally," shows some greater restriction on or reservation of rights" than is normally presumed.[18] *Watson v. Banducci*, 973 P.2d 395, 400 (Or. Ct. App. 1999); *see also Loveridge III*, 148 Fed. Cl. 279, 286 (citing *Motes v. PacifiCorp*, 217 P.3d 1072, 1078 (2009) (an easement holder may "change the use of its easement so long as it does not substantially increase the burden on the servient estate") (quotation and citation omitted); *Cotsifas v. Conrad*, 905 P.2d 851, 853 (1995) (substantial interference involves more than petty annoyance); *Long v. Sendelbach*, 641 P.2d 1136, 1138 (1982); *Jones v. Edwards*, 347 P.2d 846, 849 (1959)). Oregon law, in other words, treats easement rights as "non-exclusive," which the United States asserts is vital to the damages analysis. (*See* Def.'s Post-Trial Br. at 14).

The United States opposes any notion that the Trails Act imposes an exclusive trail use easement to support the statutory purpose of railbanking. (Def.'s Post-Trial Br. at 14). The text of the Act, the United States maintains, does not grant exclusive control of the corridor to the trail sponsor, mandate the creation of an exclusive easement, or preclude preexisting uses by the servient estate from continuing. (*Id*. at 15). The United States also relies on an STB decision that held that the Trails Act allows for routine, non-conflicting uses permitted under state law. (*Id*. at

---

[18] Plaintiffs' expert, Mr. Matthews, was neither instructed on nor reviewed relevant Oregon law. (Trial Tr. Matthews, at 422:10–17). The United States also suggests that *Boyer v. United States*, 135 Fed. Cl. 121, 127, 130 (2017) and *Moore v. United States*, 61 Fed. Cl. 73, 78-79 (2004), determined that crossing rights in a railroad corridor were not assumed destroyed.

16 (citing *Jie Ao & Xin Zhou—Petition for Declaratory Order*, Docket No. FD 35539 (STB June 6, 2012), 2012 WL 2047726)). The Court gives credence to this argument.[19]

Credible testimony suggests some adherence to Plaintiffs' crossing rights and other improvements.[20] Thus far, eight years in, Plaintiffs continue to use their lands without change. (Trial Tr. Sumption, at 392:17–393:23). For example, Camp Double J's septic system falls within the railway right-of-way. (Trial Tr. Joslin, at 82:20–22). It exists absent agreement or approval from POTB. (*Id*., at 82:13–84:18 (confirming no communication with POTB regarding the septic system until shortly before trial)). Parts of Jetty Fishery's property—including the business's shop, store, and crab storage tanks—are within the corridor. Again, they persist without written agreement. (Trial Tr. D. Laviolette, at 176:23–177:5; J.A. Tab 51, PX11C.23; J.A. Tab 38, JX33.25, JX33.28, JX33.34; J.A. Tab 21, JX22.1 ("[F]or the encroach of Lessee–owned porch")). Jetty Fishery also stores a boat in the right-of-way and constructed and maintained a permanent business sign in the corridor, both without approval from POTB. (J.A. Tab 29, JX33.9; J.A. Tab 30, JX33.10; Trial Tr. S. Laviolette, at 108:15–110:15, 174:15–175:6). And nothing in the trial testimony suggests that Jetty Fishery customers are restricted from crossing the railway corridor to gain access to the business. (*See* J.A. Tab 24, JX24; J.A. Tab 27, JX33.7).

At present, STIA has not impaired Plaintiffs' use of any portion of their property that encroaches on the railway or access to their properties. (Trial Tr. Sumption, at 393:8–23). Nor has STIA communicated a future intent to do so. (*See* Trial Tr. Joslin, at 79:21–80:2; Trial Tr. D. Laviolette, at 176:22–178:5, Trial Tr. Sumption, at 390:3–12).[21] As a trail representative stated, after speaking with at least two property owners regarding "concerns about the trails," she could

_____

[19] It is worth noting that other judges of this Court have repeatedly dismissed the contention that the Trails Act preempts all uses of encumbered property by the servient landowner. *E.g.*, *Cheshire Hunt, Inc*. *v*. *United States*, 158 Fed. Cl. 101, 107–08 (2022); *Dana R*. *Hodges Trust*, 111 Fed. Cl. 452, 457 (2013); *Sears v. United States*, 132 Fed. Cl. 6, 26 (2017), *aff'd per curiam*, 726 F. App'x 823 (Fed. Cir. 2018). "State law claims that do not deal with abandonment issues are not preempted by the Trails Act." *Sears*, 132 Fed. Cl. at 26 (citing *Dana R*. *Hodges Trust*, 111 Fed. Cl. at 456–57).

[20] There were previous agreements with POTB regarding crossing rights and encroachments. (*See* J.A. Tab 17, JX11; J.A. Tab 18, JX12; J.A. Tab 21, JX22; J.A. Tab 23, 24). Despite ongoing conversations involving property owners, POTB, and STIA, the agreements have not been renewed. (Trial Tr. Joslin, at 58:17–63:12; Trial Tr. Sumption, at 415:4–25; Trial Tr. Bradley, at 599:2–600:14, 606:10–607:2).

[21] As Ms. Sumption testified, a recognition that buildings within the corridor could impact trail construction, (Trial Tr. Sumption, at 405:18-25 (discussing J.A. Tab 47, JX56.33)), does not equate to STIA's intent to destroy the buildings. (*Id*. at 418:3-8). As a matter of common sense, the Court endorses this recognition because concept plans can identify interferences with a potential concept not to signal that such barrier will be removed but to highlight why certain plans may not be easily achieved.

not see how constructing the trail in a way that interfered with the owner's improvements "would even be in the realm of possibilities." (Trial Tr. Sumption, at 389:7–390:11, 390:5–11, 418:7–9 (impact plan does not mean encroaching buildings would be demolished)). Even Plaintiffs' own expert indicated that "I think everyone's decided that existing crossing would continue . . . ." (Trial Tr. Matthews, at 428:16–18).

The Court concludes that assigning value under these circumstances would involve improper speculation. As the Supreme Court stated in *Olson v. United States*:

> Elements affecting value that depend upon events or combinations of occurrences which, while within the realm of possibility, are not fairly shown to be reasonably probable, should be excluded from consideration, for that would be to allow mere speculation and conjecture to become a guide for the ascertainment of value—a thing to be condemned in business transactions as well as in judicial ascertainment of truth.

292 U.S. at 257.

Given the lack of physical interference over eight years and the low likelihood of future interference, the Court finds that the property owners have not lost crossing rights or the use of their improvements. Any unrealized loss of those improvements and crossing rights offend notions of "just" compensation and would constitute a windfall. Neither side has calculated the value of using the crossing rights and improvements. It is therefore impossible to assign a specific value when calculating damages. Since proof of the economic value of these rights remains unknown after trial, the Court cannot apply a non-speculative discount to Plaintiffs' claimed damages.

*C. Damages*

It is against this background that the Court considers the parties' proposed damages calculations. Based on the findings and path detailed to this point, calculating just compensation has proven unduly arduous. It remains unclear whether this complexity stems from the adversarial positions of the parties or the inherent challenge of the legal framework, but the certainty is that it should not be this difficult. The equation is complicated by extraordinary circumstances arising from OCSR's operation, a fact significantly impacting what would otherwise be a straightforward appraisal process and necessitating the efforts of skilled counsel and experts to confront unprecedented challenges. In reviewing the experts' laudable efforts to grapple with the unusual facts presented here, the Court finds that unforced errors on both sides render reliance on both parties' calculations impossible to accept. Upon careful consideration, the Court concludes that expert testimony was not sufficiently probative and that, based on the evidence, a determination of just compensation is impracticable.

It is well-settled that the government must pay for what it takes. *Darby Dev. Co., Inc. v. United States*, 112 F.4th 1017, 1033 (Fed. Cir. 2024) (quoting *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 148 (2021)). But attaching value to this is not a simple task even in the best of circumstances. In *Yuba Goldfields, Inc. v. United States*, the Federal Circuit observed that the law of just compensation is hardly a model of clarity. 723 F.2d 884, 887 (Fed. Cir. 1983).

Instead, it is characterized by "confusing and incompatible results, often explained in conclusionary terminology, circular reasoning, and empty rhetoric." *Id.* (quoting Arvo Van Alstyne, *Taking or Damaging by Police Power: The Search for Inverse Condemnation Criteria*, 44 S.C.L.Rᴇᴠ. 1, 2 (1970)); *accord Allard v. United States*, 173 Fed. Cl. 207 (2024). As established above, courts typically look to the "fair market value" standard. *564.54 Acres of Land*, 441 U.S. at 511. Under the fair market value standard, damages equal what a willing buyer would have paid in cash to a willing seller at the time of the taking. *Id.*

"In ascertaining market value, consideration should be given to all matters that might be brought forward and reasonably be given substantial bargaining weight by persons of ordinary prudence . . . ." *Rasmuson*, 807 F.3d at 1346 (citing Appraisal Institute, Uniform Appraisal Standards for Federal Land Acquisition § B–2 (2000 ed.)); *see also 564.54 Acres of Land*, 441 U.S. at 511 (defining fair market value as what a willing buyer would pay in cash to a willing seller at the time of the taking)). The burden to establish this lies solely with the property owner. *See Otay Mesa*, 779 F.3d at 1323 ("Once a taking has been established, it is the landowner who bears the burden of proving an actual loss has occurred.") (citing *Bd. of Cnty. Supervisors of Prince William Cnty., Va. v. United States*, 276 F.3d 1359, 1364 (Fed. Cir. 2002)); *accord Hedstrom Lumber Co. v. United States*, 7 Cl. Ct. 16, 28 (1984) ("The burden of establishing the value of the property taken rests upon the claimant."); *United States v. Sowards*, 370 F.2d 87, 92 (10th Cir. 1966) ("The burden rests upon the owner to establish by competent evidence his right to substantial compensation.") (citations omitted). "To carry its burden, the landowner must show actual damages 'with reasonable certainty,' which 'requires more than a guess, but less than absolute exactness.'" *Otay Mesa*, 779 F.3d at 1323 (quoting *Precision Pine & Timber, Inc.*, 596 F.3d at 833); *see also Collective Edge, LLC v. United States*, 171 Fed. Cl. 736, 753 (2024).

The Federal Circuit has noted that the quantum of damages must "be shown to a reasonable approximation," or, stated differently, "estimated with a fair degree of accuracy." *Ark. Game & Fish Comm'n v. United States*, 736 F.3d 1364, 1379 (Fed. Cir. 2013) (internal quotations and citations omitted). The property owner is "entitled to be put in as good a position," monetarily as if the "property had not been taken." *Olson*, 292 U.S. at 255. Yet, as the Supreme Court has cautioned that while the property owner "must be made whole," he "is not entitled to more." *Id.*

Plaintiffs proffered myriad testimony to establish compensation—including that of Mr. Matthews. However, his input regarding the necessary quantum to make Plaintiffs whole is suspect. Mr. Matthews assumed propositions with which the Court disagrees including: (1) a failure to account for the 100-foot easement utilized by OCSR in the before condition, (Trial Tr. Matthews, at 464:6–13 (agreeing that none of his appraisals account for OCSR use of full easement in before condition and to do so would require "new analysis.")); (2) exclusion of OCSR in the before condition despite his claims otherwise; (3) completion of the recreational trail despite there being—as of yet—no substantial step towards construction or funding of a trail, (*id.*, at 468:1–7); (4) complete loss of crossing rights and similar encroachments; (5) appraisals did not account for OCSR's 100-foot easement in the before condition, (*id.*, at 466:5–9); and (6) the location of the yet-to-be-realized trail along the western edge of the corridor, i.e., the worst scenario for Plaintiffs, (*id.*, at 482:19–483:19). Moreover, Mr. Matthews refused to discuss the concept of windfalls in the calculation of damages and the arithmetic within his expert report was incorrect. (Trial Tr. Matthews, at 513:8– 515:12). Each of these factors impact

credibility. *See e.g.*, *United States v. N. Paiute Nation*, 183 Ct. Cl. 321, 346 (1968) (recognizing that the trial court is charged with assessing whether valuation amount is "supported by all the evidence.").

The requirement that courts consider the entirety of relevant evidence is mirrored in the methodology encouraged for government appraisers. The Court has held that plaintiffs are not strictly bound by the Yellow Book for land valuation. *Ideker Farms*, *Inc. v. United States*, 151 Fed. Cl. 560, 603 (2020) ("As an initial matter, the Yellow Book applies to only those appraisals being conducted at the request of the government."), *aff'd in part*, *vacated in part*, *remanded on other grounds*, *Ideker Farms*, *Inc. v. United States*, 71 F.4th 964 (Fed. Cir. 2023) (citing *Hardy*, 141 Fed. Cl. at 32 ("[A]s a matter of law, [Plaintiffs' appraiser] was not bound by the Yellow Book. The Yellow Book applies only to appraisers hired by the federal government for condemnation purposes; it is not mandatory with respect to appraisers not hired by the government.")). However, in novel circumstances that are heavily dependent on the real-world circumstances of the property, appraisers should provide a clear and compelling explanation for deviations from its guidelines.

Explanation for deviation is especially important when the Yellow Book's approach is widely accepted and considered to be standard practice. Despite Mr. Mathews postulating that he was required to assume the eventual construction of a trail in the most damaging configuration, such a requirement is not justified by the Yellow Book, nor was Mr. Matthews able to identify any such requirement when asked at trial. (Trial Tr. Matthews, at 470:15–23, 474:8–16). In circumstances such as these, the Yellow Book does not endorse dogmatic adherence to hard and fast rules:

> Appraisers must exercise sound judgment *based on known pertinent facts and circumstances*, and it is their responsibility to obtain *knowledge of all pertinent facts and circumstances* that can be acquired with diligent inquiry and search. They must then *weigh and consider the relevant facts* with good judgment and make their decision, entirely on their own, in a sound professional manner, completely unbiased by any consideration favoring either the owner or the government.

Yellow Book at 204 (emphasis added). The presumption that appraisers must assume a trail is already constructed in the maximally damaging manner will always favor claimants, sometimes at the unjustified expense of taxpayers. This is problematic in cases such as these, where the likelihood of trail construction is slim and affects the overall uncertainty important to prospective buyers.

Additionally, Plaintiffs seek compensation for the full market value of improvements within the corridor, even though they have enjoyed full and unfettered access to those improvements for both personal and profit-making purposes for eight years since the NITU was issued. (*See generally* Pls.' Post-Trial Br.). The Court simply cannot envision a clearer example of awarding a windfall. *See Agapion*, 167 Fed. Cl. at 777. Despite opining on other matters of potential impact, Mr. Matthews avoided responding to the Court's inquiries about potential windfalls. When asked directly, Mr. Matthews demurred:

> COURT:       So there was a question that came in about [compensating] windfalls, and you said of course we can't.
>
> MATTHEWS: I don't have an opinion.
>
> COURT:       Okay. And that's fine. Are windfalls discussed somewhere in the Yellow Book?
>
> MATTHEWS: No. Not to my knowledge.

(Trial Tr. Colloquy, at 505:1–7; *see also* Trial Tr. Matthews, at 493:3–8 (offering no opinion whether being paid for loss of improvements while retaining use of improvements constitutes windfall)). Plaintiffs' rebuttal expert also deflected when asked directly about windfalls; when asked the meaning of the term and its use within the Yellow Book, the only response was that "windfall's not an appraisal term." (Trial Tr. Kilpatrick, at 936:24–937:3).

This is incorrect. The Yellow Book references the windfall principle numerous times. Yet, this topic seemed to evade both of Plaintiffs' experts.[22] Yellow Book at 16, 95 (in acquisitions under the Uniform Act, the assignment may instruct the appraiser to consider changes in value due to physical deterioration within the owner's reasonable control to avoid windfalls), 98 (advising appraisers "to request legal instructions on how to treat government–constructed improvements that predate the date of value," to heed "the equitable principle which condemns unjust enrichment," and to prevent the value of government-built premises "becoming a *windfall* to the owner of the land in the guise of fair compensation." (emphasis added)), 113 ("Thus, to allow landowners to receive compensation not only for their property but for diminution in value to land owned by another would be a windfall and an unfair enrichment rather than just compensation."), 134 n.563 (citing *Rasmuson* for the proposition that holding valuation of agricultural property that "does not take into account the costs of removing [existing] physical remnants of [a] railway will result in an artificially inflated value and yield a windfall to the landowner"), 190 ("Paying compensation for such values would permit private owners to receive *windfalls* to which they are not entitled under the Fifth Amendment." (emphasis added)). An unwillingness to engage with this common principle in assessing just compensation also impacts credibility.

Lastly, Mr. Matthews' report readily displayed mathematical errors. (Trial Tr. Matthews, at 513:8–515:12). While these mistakes did not impact the final damage amount, such blatant errors in conjunction with other shortcomings are noteworthy and impact credibility.

---

[22] Prior to trial, the Court requested that witnesses' references to the Yellow Book be anchored to specific provisions to enable the Court to locate that reference. (*See* Colloquy, Mot. in Lim. Hrg. Tr., at 92:9–17, ECF 229). They did not, though a complete Yellow Book was provided for the Court to explore at its leisure. (J.A. Tab 48, JX58 (referred to as "Yellow Book")). The lack of reference to specific provisions of the Yellow Book is frustrating. As an example, when asked where in the Yellow Book appraisers were instructed to value a property as if the trail were completed—one of the dominant issues at trial—he was unable to do so. (Trial Tr. Matthews, at 474:9–13).

Additionally, though raised before trial, it became apparent during the trial that Mr. Matthews's initial assessment of the Old Mill property was inaccurate due to misunderstandings about the road frontage and maps. Like his explanation of the omission of OCSR in the before condition, Mr. Matthews's explanation of this issue was unconvincing. (*See generally* Trial Tr. Matthews, at 430:2–434:22, 439:1–446:2). In assessing the Old Mill property initially, Mr. Matthews was also unsure whether OCSR was operating, and if so, he concluded it did not affect valuation. (*Id.* at 438:12–18).

Plaintiffs' expert's failure to adequately explain deviation from the Yellow Book's guidelines, coupled with his inability to convincingly demonstrate how the existing scenic train would not significantly impact the property's present value, renders complete reliance on Mr. Matthews's methodology and conclusion unwarranted.

While the property owners have the burden of proof, the United States' expert, Ms. Hasson, is not more credible. As discussed previously, her valuation in the after condition for Jetty Fishery and Camp Double J after the taking showed no diminution in value. (J.A. Tab 55, DX02; J.A. Tab 56, DX03). Closer examination shows that her valuation in the before condition for the Jetty Fishery and Camp Double J were identical despite one being residential and one distinctly commercial. (J.A. Tab 55, DX02; J.A. Tab 56, DX03). This deviation was not adequately explained.

As instructed by counsel, Ms. Hasson incorrectly accepted that the before condition includes the preexisting POTB freight easement, rather than the OCSR easement, despite the actual abandonment of freight operations and the NITU. (*See e.g.*, J.A. Tab 55, DX02.0004 ("Legal Instructions" for the before condition include "the property is subject to the existing railroad corridor and POTB's existing railroad easement.")). Per her instructions, Ms. Hasson's before valuation utilized comparable properties along the Oregon coast with similar zoning, highest and best use, and physical characteristics. (J.A. Tab 54, DX1.58–74, 90–112; J.A. Tab 55, DX2.48–73; J.A. Tab 56, DX3.49–63; Trial Tr. Hasson, at 702:15–17, 703:24–710:9). Ms. Hasson qualified her search for properties with a permanent easement for railroad use, narrowing her results to a single property. (Trial Tr. Hasson, at 716:16–23). Her additional research for open-marketed properties burdened by a railroad easement resulted in five examples. (*Id.* at 722:20–725:6, 727:2–11; J.A. Tab 54, DX1.74). Ms. Hasson concluded that properties subject to a permanent railroad easement provide no contributory value to Plaintiffs. (Trial Tr. Hasson, at 725:9–726:13).[23]

This comparison does not pass muster as it fails to account for the inherent difference between active freight railways and passenger rail services like OCSR—the reality existing in Tillamook County, Oregon. This distinction and Ms. Hasson's position that willing buyers would

---

[23] Hasson provided three explanations for her conclusion: (1) marketing materials for her comparables did not include the area within the railroad corridor in the listing; (2) the county assessor's data also did not include the land within the railroad corridor as part of the overall property size; and (3) non-specific communications with real estate agents that represented buyers and sellers of properties alongside railways. (Trial Tr. Hasson, at 725:9–726:13).

attribute no value to property within a railway easement is unsound. Those portions potentially affected included septic improvements, signage, and crossing access. In addition, disparities between actual and listed size can be credibly attributed to another cause: uncertainty about ownership and control. Plaintiffs concerns here are justified.

Hasson's conclusions gainsay the United States' position regarding the non-exclusivity of the easement. As previously discussed, the United States contended that Plaintiffs "retain[] full dominion and use of the land subject to an easement," so far as their use does not interfere with "the fair enjoyment of the easement" to STIA and OCSR. (Def.'s Post-Trial Br. at 14). Ms. Hasson's assumption that the areas burdened by the easement have no contributory value is unreasonably broad.

In addition, neither of the United States' expert's reports nor testimony paints a clear picture of the nature of the easements in comparable properties. Ms. Hasson's report does not establish if the easement areas excluded from the listing were used in any other way. For example, in this case, facts at trial showed that Jetty Fishery constructed and maintained a permanent business sign in the easement area. (J.A. Tab 29, JX33.9; *see also* Trial Tr. S. Laviolette, at 110:1–16). The United States points to this historic use and the absence of any interference from POTB or trail manager to argue that the easement area accommodates shared use. (*See* Def.'s Post-Trial Br. at 13–16). If the owners of Jetty Fishery attempt to sell the property to another business, it is probable that the sign will change to promote the new business. Handing over such use of the easement area can very realistically be part of the bargain between Jetty Fishery and the new buyer. In other words, the United States' admission that the property owners are entitled to continue many of the frequent uses of the easement area, (*see generally id*. at 13–21; Trial Tr. Hasson, at 818:2–8 (answering question about instructions to consider non-exclusivity of easement when calculating just compensation)), is itself a concession that owners possess usage rights that are of some value and perhaps subject to sale. Ms. Hasson's report does not include sufficient details to ensure that the easement areas in the comparable properties resemble the easements for these properties.

The United States' expert also finds that the new trail use easement had no market effect on improvements in the after condition, largely due to the public understanding in 2016 that the development of any trail was uncertain. (Trial Tr. Hasson, at 752:1–4). Ms. Hasson testified that she attempted to quantify the impact of uncertainty about where the trail may be placed on the market value of the properties, but she met obstacles. First, Hasson was unable to find any comparable sales experiencing similar uncertainty. (*Id*., at 755:6–756:80). Ms. Hasson testified that she could only find comparables where improvements were impacted with 100-percent certainty and ones where there was 100-percent certainty that improvements would be impacted; Hasson found this range far too broad to have any utility and was susceptible to speculation. (*Id*., at 757:16–24). Second, Hasson looked at discounting future income loss to the property, but this was not possible given that there is no timeline for when the trail will be built. (*Id*., at 756:8– 757:2). Ms. Hasson also testified that she could not find studies or journal articles describing similar situations, particularly through the Appraisal Institute's Lum Library. (*Id*., at 757:5–15). Ms. Hasson explained that, as an appraiser, it would be inappropriate for her to posit definitively where the trail would be built based on the information available to her. (*Id*., at 760:21–761:6).

With this background, Ms. Hasson concluded there was no difference in the before and after values of the properties. (*See e.g.*, J.A. Tab 54, DX01; J.A. Tab 55, DX02; J.A. Tab 56, DX03; Trial Tr. Hasson, at 752:1–4, 817:13–1).This conclusion ignores the fraught reality—not only may a trail someday still result in the loss of home and valuable components of commercial opportunity, but the owners have definitively lost property rights, including the right to exclude others.[24] *See United States v. General Motors Corp.*, 323 U.S. 373, 377–78 (1945) (ownership includes "rights inhering in the citizen's relation to the physical thing" including possession, use, and disposal). That important right now belongs to STIA and POTB.

The uncertainty created by the parties' experts has left the Court in a precarious position, having considered multiple avenues.[25] (Trial Tr. Colloquy, at 963:17–22 ("[T]here are a number of options here. I can completely accept plaintiffs' appraisals. I can completely accept the defendant's appraisals. I could disagree to some extent with both of them and try to fashion something which is consistent with what the Court believes to be full compensation.")).[26] When

---

[24] The uncertainty of those rights was appropriately expressed by Mr. Matthews: "I think someone would look at it and think, hmm, government might take my property. I'm not going to pay much for it. Probably nothing. It's in the right-of-way. It destroys the title. It's a cloud on the title." (Trial Tr. Matthews, at 473:14–18, 231:17–23 ("[W]hen you start thinking about what's being taken, it's pretty much all private rights are being taken. The right to exclude others is being taken. The right to build a building on there is being taken, to grow crops, to fence it[,]" concluding that all the things that you might[ ]do to your property, . . . have been taken.")).

[25] In addition to the options mentioned at trial, the Court has more recently considered additional alternatives including the appointment of an expert independent of each party to assess damages. *See* FRE 706 ("[o]n a party's motion or on its own, the court may order the parties to show cause why expert witnesses should not be appointed . . . ."). The Court has also attempted to craft a damages award consistent with notions of just compensation but is unable to do so based on the evidence presented at trial.

[26] As the Federal Circuit recognizes, the Court may award damages, even if it does not "fully credit [a] party's methodology." *Precision Pine & Timber, Inc. v. United States*, 596 F.3d, 817, 833 (2010). While the Court acknowledges certain methodological shortcomings in Plaintiffs' proffered analysis, it is important to note that, were it not for the significant oversight and seeming disregard of the pre-existing scenic train, the Court would be more inclined to accept Mr. Matthews's valuation. The other identified issues, such as the potential impact of future trail development, while relevant and the deviation from the Yellow Book, while concerning, do not necessitate pure speculation. As the Federal Circuit recognizes, the Court may award damages, even if it does not "fully credit [a] party's methodology." *Precision Pine & Timber, Inc.*, 596 F.3d at 833. In the "context of setting just compensation," and "especially where dealing with irregular parcels," the Court acknowledges that "valuation transcends mere mathematical calculation," and demands "exercise of judgment—first by the experts," but "ultimately by the Court." *Wash. Metro Area Transit Auth. v. United States*, 54 Fed. Cl. 20, 36 (2002). However, the failure to adequately account for the existing scenic rail use undermines the credibility of the valuation and renders the Court unable to calculate any level of just compensation.

both parties' valuations contain errors, the Court may use either as the basis from which the Court can extrapolate damages. *See Waverley View Inv'rs*, *LLC v. United States*, 135 Fed. Cl. 750, 814 (2018). As the Federal Circuit held in *Otay Mesa*, the Court is suited to look "at the evidence as a whole," and use its "own methodology," to calculate damages, as the Court "is not necessarily stuck with the stark choice of accepting or rejection of a party's valuation . . . ." 779 F.3d at 324, 1326 (Fed. Cir. 2015); *see also Seravalli v. United States*, 845 F.2d 1571, 1575 (Fed. Cir. 1988) ("We are unwilling to restrict the trial courts to any single basis for determining fair market value. Those courts necessarily must have considerable discretion to select the method of valuation that is most appropriate in the light of the facts of the particular case. It may be a single method or some combination of different methods.").

The Court cannot completely discount the uncertainty created by the issuance of the NITU. While the Court is convinced that a trail may never result given the elapsed years since the NITU with no prospect that construction draws near in the ensuing years, it cannot overlook the legal and factual hazard that it may yet occur. As Plaintiffs compellingly argue, the 2017 trail plan presents legitimate concerns that trail construction on the west side of the corridor may impact the Laviolette's and Joslin's use of their home and business; similarly, construction on the east side of the corridor would destroy or damage the commercial parking for the fishery. (*See* J.A. Tab 47, JX56.34, 56.52, 56.64, 56.70; Trial Tr. Sumption, at 405:5–410:7). Declaring that the uncertainty created by the Government's action resulted in no compensable harm is unacceptable. Moreover, without dispute, Plaintiffs have lost at least one important right as the result of the Government's taking—the right to exclude. *Mitchell Arms*, *Inc*. *v. United* States, 7 F.3d 212, 215 (Fed. Cir. 1993) (*citing Hendler v. United States*, 952 F.2d 1364, 1374 (Fed. Cir. 1991); *see also Kaiser Aetna v. United States*, 444 U.S. 164, 179–80 (1979) ("[T]he 'right to exclude,' so universally held to be a fundamental element of the property right, falls within this category of interests that the Government cannot take without compensation").

The problem lies in the sufficiency of evidence. While it is true that both sides' experts may have presented challenges or shortcomings in their testimony, the burden of proof ultimately rests with plaintiffs. *Otay Mesa*, 779 F.3d at 1323. Though the United States' expert was equally uncompelling, defendants are not required to prove the absence of damages; rather, they can simply argue that the plaintiff has failed to meet their burden of proof. A court cannot arbitrarily determine just compensation. *See Cully Corp*. *v. United States*, 163 Fed. Cl. 676, 688 (2022) (awarding zero damages after taking was established because plaintiff failed to offer affirmative evidence proving that it suffered actual monetary loss compensable under the Fifth Amendment); *Lisbon Contractors*, *Inc*. *v. United States*, 828 F.2d 759, 767 (Fed. Cir. 1987) (finding that plaintiffs are tasked with "proving the amount of loss with sufficient certainty so that the determination of the amount of damages will be more than mere speculation."). Such a determination must be grounded in evidence and legal precedent.

To fashion compensation when so many open variables would be speculative and would not provide fair and just compensation to the property owner; the Court must rely on sound appraisal principles and expert testimony to arrive at a reasonable valuation. *See Gadsden Indus*. *Park*, *LLC v. United States*, 956 F.3d 1362, 1373 (Fed. Cir. 2020) (when calculating just compensation trial court must "resolve on its own with reasonable certainty based on the evidence available."). Any deviation from these principles would undermine the fundamental principles of just compensation. *Id*., 956 F.3d at 1370 (holding that trial court in a takings case is

not obligated to fashion its own award when a "plaintiff has not provided evidence sufficient to determine just compensation with reasonable certainty.").[27] As Plaintiffs have not proven just compensation with the requisite degree of certainty, the Court is unable to determine an appropriate damage award. Accordingly, judgment shall be entered for the United States.

### III.    Conclusion

The Court finds and concludes that Plaintiffs failed to carry their burden to prove just compensation for their Fifth Amendment takings claim. Pursuant to RCFC 58, the Clerk is **DIRECTED** to enter final judgment in favor of the United States.

**IT IS SO ORDERED.**



s/    David A. Tapp
DAVID A. TAPP, Judge

---

[27] There is some debate as to the constitutionality of "zero damages" takings cases. However, the Supreme Court has noted that they "have often recognized the existence of a constitutional right, or established the test for violation of such a right (or both), and then gone on to find that the claim at issue fails." *Stop the Beach Renourishment, Inc. v. Fla. Dep't of Env't Prot.*, 560 U.S. 702, 716–17, (2010) (citing *New Jersey v. T.L.O.*, 469 U.S. 325, 333, 341–343 (1985) (holding that the Fourth Amendment applies to searches and seizures conducted by public-school officials, establishing the standard for finding a violation, but concluding that the claim at issue failed); *Strickland v. Washington*, 466 U.S. 668, 687, 698–700 (1984) (recognizing a constitutional right to effective assistance of counsel, establishing the test for its violation, but holding that the claim at issue failed); *Hill v. Lockhart*, 474 U.S. 52, 58–60 (1985) (holding that a *Strickland* claim can be brought to challenge a guilty plea, but rejecting the claim at issue); *Jackson v. Virginia*, 443 U.S. 307, 313–320, 326 (1979) (recognizing a due process claim based on insufficiency of evidence, establishing the governing test, but concluding that the claim at issue failed); *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 390, 395–397 (1926) (recognizing that block zoning ordinances could constitute a taking, but holding that the challenged ordinance did not do so); *Chicago, B. & Q. R. Co. v. Chicago*, 166 U.S. 226, 241, 255–257 (1897) (holding that the Due Process Clause of the Fourteenth Amendment prohibits uncompensated takings, but concluding that the court below made no errors of law in assessing just compensation)).